# City of Scranton *v.* The Public Service Commission.

*Public Service Commission—Public Service Company Law—
Order of Public Service Commission—Valuation—Rates—Appeals
—Review by Superior Court — Appeals by company — Appeal by
complainant.*

Section 23, of article VI, of the Public Service Company Law
provides that, on appeal, the orders of the commission shall be prima
facie evidence of the reasonableness thereof, and the burden of
proving the contrary shall be upon the appellant.

The Public Service Company Law of 1913, as amended by the
Act of 1915, neither requires nor authorizes the Superior Court to
fix and determine for itself the rates, charges, etc., that a public
service company may exact. Its function is but to decide whether
or not the appellant has discharged the burden cast upon him by
the legislature. The findings and determinations of the commis-
sion being prima facie evidence of their correctness, the burden is
upon the appellant to establish, from the records certified from the
commission, that the determination is not reasonable and in con-
formity with law.

On appeal from the decision of the Public Service Commission,
fixing the valuation of the property of a street railway company
for rate-making purposes at $9,000,000, the order of the commission
will be affirmed, where the respective estimates of the cost of re-
production vary from $7,386,047.35 to $11,157,949.99, and there is
other evidence to support the findings.

An appeal by a complainant from the finding of the Public Serv-
ice Commission involves no right of property or question of con-
fiscation which requires judicial determination within the pro-
tection of the Fourteenth Amendment of the United States Con-
stitution.

The appellant does not have the constitutional right to a hearing
de novo by the Superior Court, and its independent judgment as to
the reasonableness of the finding of the commission. No question
of any constitutional right is involved in such appeal, and the
revisory powers of the appellant court are only to determine whether
or not the order of the commission was reasonable and in con-
formity with law.

Argued December 6, 1921. Appeal, No. 152, Oct. T.,
1921, by complainant, from order of the Public Service

Commission of the Commonwealth of Pennsylvania, Complaint Docket, Nos. 1687-1917, and 2351-1918, in case of City of Scranton v. Scranton Railway Company. Before Porter, Henderson, Head, Trexler and Keller, JJ. Affirmed.

Complaints of City of Scranton against schedules filed with the Public Service Commission by Scranton Railway Company increasing rates of fare for transportation of passengers within said city.

The Public Service Commission made an order authorizing the respondent to file a schedule providing for an $.08 cash fare and a ticket rate established on a basis of four tickets for $.30, the schedule to remain in effect for a period of twelve months. Complainants appealed.

*Error assigned,* among others, was the order of the Public Service Commission.

*Joseph F. Gunster,* Assistant City Solicitor, and with him *R. S. Houch,* City Solicitor, for appellant.

*H. B. Gill,* for Scranton Railway Company, intervening appellee.

*Frank M. Hunter,* Counsel, and with him *John Fox Weiss,* Assistant Counsel, for the Public Service Commission.

Opinion by Porter, J., April 16, 1923:

The Scranton Railway Company is the owner and operator of approximately ninety-two miles of street railway in Lackawanna and Luzerne Counties, extending from Forest City on the north to the City of Pittston on the south. Of this ninety-two miles of track about one-half is within the City of Scranton. The portion of the track within the City of Scranton, constituting an integral and essential part of the system, was built under fran-

chise ordinances limiting the rate of fare to be charged by the company to five cents. In 1917 the railway company filed with the Public Service Commission a schedule of rates increasing its rate of fare from five to six cents, and in 1918 filed a second schedule increasing its rate of fare from six to eight cents. Against both increases the City of Scranton filed complaints, alleging the increased rates to be illegal because of the ordinance limitation, above mentioned, and further alleging the new rates to be unjust, unreasonable and unwarranted. The commission filed a preliminary report and order holding that the fare limitation prescribed by the ordinance had been superseded by the passage of the Public Service Company Law, suggesting a conference of engineers, representing the city, the railway company and the Public Service Commission, for the purpose of submitting a report upon the valuation of the property of the railway company, and establishing a temporary fare of seven cents cash or four tickets for twenty-five cents, and directing the valuation of the property of the railway company, used and useful for the public service, for the purpose of determining a permanent rate of fare. From this order the city appealed to this court, which affirmed the order, and the judgment of this court was affirmed by the Supreme Court, upon appeal to that tribunal.

The Public Service Commission, upon the return of the record, proceeded with the inquiry necessary to a valuation of the property of the railway company. The City of Scranton did not appoint an engineer to represent it and the conference as finally consummated consisted of an engineer representing the railway company and the chief of the Bureau of Engineering and his assistants of the Public Service Commission. The City of Scranton participated in the engineering conference only to the extent of supplying such information as Dr. Snow, the chief engineer of the Public Service Commission, requested and agreeing through its engineering department to some of the unit prices used by the conference. The

engineering conference submitted an exhaustive report, much testimony was taken and many exhibits submitted which have resulted in a printed record of more than twenty-two hundred and fifty pages. The commission, after a patient consideration of all the testimony which the parties saw fit to present and a careful study of the exhaustive report of the engineers, as explained by the testimony of the engineers and other witnesses, filed a report clearly disclosing that they had given intelligent consideration to all the elements indicated by the Public Service Company Law as proper in arriving at a determination of the fair value of the property of the railway company, used and useful for the public service, and found that value to be nine million dollars. The Public Service Commission made a final order authorizing the Scranton Railway Company to file, post and publish according to law, a new tariff schedule providing for an eight-cent cash fare and a ticket rate established on the basis of four tickets for thirty cents, said tariff schedule to remain in effect for a period of twelve months, at the expiration of which period the commission will make such further order as it deems necessary. It further ordered that the railway company file with the commission monthly reports of receipts, expenditures and traffic data under such tariff schedule; any surplus income derived from such tariff schedule to be credited to the annual depreciation allowance provided for in the report. The City of Scranton appeals from this determination of the commission. The city in its brief states the questions involved to be: "(1) The determination of the fair value of intervener's property used and useful in the public service, under the Public Service Company Law of 1913." "(2) And, finally, a determination of a just and reasonable rate of fare on respondent's lines within the City of Scranton."

The views of counsel for the parties in this case expressed in their briefs and at their oral arguments, as to the principles which must govern the exercise of our ju-

risdiction in appeals of this character, widely vary. Counsel for the appellant contends that we are vested with jurisdiction, and it is our duty, not merely to decide whether the findings of the commission are supported by competent evidence, but to consider the whole record and evidence and determine, upon our own independent judgment as to the law and facts involved, what is the fair value of the property of the railway company used in the public service, and in support of this proposition cites the decision of the Supreme Court of the United States in Ohio Valley Water Co. v. Ben Avon Boro., 253 U. S. 287, following which decision the Supreme Court of Pennsylvania remitted the record to this court with an order instructing it, "to determine upon its own independent judgment as to the law and facts involved, whether the order of the Public Service Commission, of which the Ohio Valley Water Company complains, is confiscatory." This question meets us at the threshold of the case and must first be considered. The contention of the appellant in the case of the Ohio Valley Water Co. v. Ben Avon Boro. was that the order of the Public Service Commission deprived it of a reasonable return upon its property used in the service of the public and thereby confiscated its property, in violation of the Fourteenth Amendment of the Constitution of the United States. The only question involved was whether the order of the commission determining the value of the property of the water company was confiscatory. It was said, in the opinion of the Supreme Court of the United States: "In all such cases, if the owner claims confiscation of his property will result, the State must provide a fair opportunity for submitting that issue to a judicial tribunal for determination upon its own independent judgment as to the law and facts; otherwise the order is void because in conflict with the due process clause, Fourteenth Amendment." The record in that case having been remitted to the Supreme Court of Pennsylvania, the case was by that court remit-

ted to this court with direction "to determine upon its own independent judgment as to the law and facts involved, whether the order of the Public Service Commission, of which the Ohio Valley Water Company complains, is confiscatory." The decision in that case cannot reasonably be said to clothe the Superior Court with the powers of a second administrative commission. "The Public Service Company Law of 1913, as amended by the Act of 1915, neither requires nor authorizes this court to fix and determine for itself the rate, charge, etc., that a public service company may exact. Our function is, as the statute declares, but to decide whether or not the appellant has discharged the burden cast upon him by the legislature. The statute makes the findings and determinations of the commission prima facie evidence of their correctness and the burden is upon the appellant to establish, from the record certified to us from the commission, that the determination is not reasonable and in conformity with law": Mt. Union Boro. v. Mt. Union Water Co., 63 Pa. Superior Ct. 337.

The contention of the appellant as to the effect upon the jurisdiction of this court, in appeals of this character, of the decision of the Supreme Court of the United States in Ohio Valley Water Co. v. Ben Avon and the subsequent action of the Supreme Court of Pennsylvania in that case, fails to give due consideration to the principles involved in the determination of the only question considered in that proceeding. While the rates for the transportation of persons and property within the limits of the State are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution of the United States secures, and, therefore, without due process of law, cannot be so conclusively determined by the legislature of the State, or by regulations adopted under its authority, that the matter may not become the subject of judicial inquiry. A public service corporation is a person within the meaning of

the Fourteenth Amendment declaring that no state shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws: Smyth v. Ames, 169 U. S. 526. "If the company is deprived of the power of charging reasonable rates for the use of its property, and such deprivation takes place in the absence of an investigation by judicial machinery, it is deprived of the lawful use of its property, and thus, in substance and effect, of the property itself, without due process of law in violation of the Constitution of the United States; and in so far as it is thus deprived, while other persons are permitted to receive reasonable profits upon their invested capital, the company is deprived of the equal protection of the laws": Chicago, Milwaukee & St. Paul Railway Co. v. Minnesota, 134 U. S. 418. The Ohio Valley Water Company, averring that the determination from which it appealed would result in the confiscation of its property, invoked the protection of the guaranties secured by the Constitution of the United States. The Supreme Court of the United States held that the company was entitled to a fair opportunity of submitting that issue to a judicial tribunal for determination upon its own independent judgment as to both the law and facts, and remitted the record to the Supreme Court of Pennsylvania for further proceedings. The Supreme Court of Pennsylvania thereupon sent the case to this court with instruction "to determine upon its own independent judgment as to the law and facts involved, whether the order of the Public Service Commission of which the Ohio Valley Water Company complains, is confiscatory." It is important to observe that the direction to this court was, not to exercise its own independent judgment upon the law and facts involved in the case generally, but was to determine whether the order of the Public Service Commission, is confiscatory; thus confining the inquiry to the single question whether the order was in violation of the Fourteenth Amendment of the Constitution of the United

States.   The Constitution of the United States is the supreme law of the land, and any legislation of a State, or regulation made under such legislation, which violates the provisions of that Constitution can certainly not be said to be in conformity with law.   The Public Service Company Law (section 22) provides: "At the hearing of the appeal the said court shall, upon the record certified to it by the commission, determine whether or not the order appealed from is reasonable and in conformity with law."   The decision of the Supreme Court of the United States, in the Ohio Valley case, and the action of the Supreme Court of Pennsylvania following that decision, definitely settle that in determining whether an order of the Public Service Commission was "in conformity with law," when the issue was whether the order was confiscatory, this court must respect and give effect to the Fourteenth Amendment of the Constitution of the United States.   That decision did not nullify any provision of the Public Service Company Law of Pennsylvania.   The provisions of that statute afford no ground for the suggestion that it was the legislative intention to infringe any provision of the Constitution of the United States, and the jurisdiction conferred upon this court to determine whether an order of the Public Service Commission appealed from is "in conformity with law" confers authority to give effect to all the provisions of the Constitution of the United States, and, also, of the Constitution of Pennsylvania.

It is not the province of the courts to enter upon the merely administrative duty of framing a tariff of rates for carriage.   It is within the scope of judicial power and a part of judicial duty to restrain anything which, in the form of a regulation of rates, operates to deny to owners of property invested in the business of transportation that equal protection which is the constitutional right of all owners of other property.   "The equal protection of the laws which, by the Fourteenth Amendment, no state can deny to the individual, forbids legislation, in what-

ever form it may be enacted, by which the property of one individual is, without compensation, wrested from him for the benefit of another, or of the public......The duty rests upon the courts, federal and State, when their jurisdiction is properly invoked, to see to it that no right secured by the supreme law of the land is impaired or destroyed by legislation": Smyth v. Ames, 169 U. S. 466; Knoxville v. Water Co., 212 U. S. 1. The function of rate-making is purely legislative in its character, whether it is exercised directly by the legislature itself or by some subordinate or administrative body. When the rate is fixed by direct action of the legislature, it can only be challenged in the courts upon the ground that it contravenes some constitutional provision, federal or State. When the rate is established by an administrative body created by statute the principle involved in a judicial inquiry as to its validity is not essentially different, although distinct questions may arise. In Inter-state Commerce Commission v. Union Pacific R. R., 222 U. S. 547, it was said: "It has been settled that the orders of the commission are final unless (1) beyond the power which it could constitutionally exercise; or (2) beyond its statutory power; or (3) based upon a mistake of law. But questions of fact may be involved in the determination of questions of law, so that an order, regular on its face, may be set aside if it appears that (4) the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or (5) if the commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it; or (6) if the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that the substance, and not the shadow, determines the validity of the exercise of the power." There can be no question of confiscation where no right of property is involved. Neither the City of Scranton nor the citizens whom it represents have any right of

property in the plant of this appellee. Their only right, growing out of the dedication of the property to public use, is to ride in the cars at such rate and subject to such regulations as the legislature, exercising the police power, may establish. This is not a right of property within the protection of the Fourteenth Amendment of the Constitution of the United States, certainly not so long as the regulation is uniform and the right is to be equally enjoyed by all persons. The legislature is the representative of the people and has power of supervision over corporations exercising quasi-public functions, which in general includes the right to regulate rates and charges of common carriers. It may, under the provisions of article XVI, section 10, of the Constitution of Pennsylvania, alter or annul the charter of this appellee, subject to the condition that the power shall be exercised only "in such manner, however, that no injustice shall be done to the corporators." "Whatever may be the law in other jurisdictions, the fundamental test in Pennsylvania is whether injustice, in the constitutional sense has been done to the corporators": Pennsylvania R. R. Co. v. Phila. Co., 220 Pa. 113. The power of the legislature to authorize street railway companies to surrender their charters, dissolve the corporation and cease to do business, cannot be questioned. No constitutional right of the city or its citizens would be infringed by such a proceeding. Their right to ride in the cars would be at an end and they would not be entitled to a review of the propriety of the proceeding by any court, exercising its own independent judgment as to the law and the facts. The right of a patron of a carrier or a consumer of the product of a public service company to raise the question of his right, asserted to be found on the Fourteenth Amendment of the Constitution of the United States, to a judicial review of the reasonableness of statutory rates does not seem to have been even raised in any case decided by the Supreme Court of the United States. The question has been decided adversely to the contention of this

appellant by courts of last resort in several of the states. In Brooklyn Union Gas Co. v. City of New York, 188 N. Y. 334, it was contended by counsel representing the city that the constitutional rights of the consumer were affected, in that the fixing of an arbitrary price which the consumer cannot question would be taking his property without due process of law; and that to deny him the right of judicial review would be to deny him the equal protection of the laws. The opinion of the Court of Appeals did not discuss the constitutional question but affirmed the order of the court of first instance, denying the right of the consumer to raise the constitutional question. That entire proceeding is fully set forth in a note to the report of the case contained in 15 L. R. A. 763. In St. Paul Book & Stationery Co. v. St. Paul Gas Light Co., 153 N. W. 262, the Supreme Court of Minnesota said: "Rate regulation whether done by the nation, state, or municipality, is by the representatives elected by the people and accountable to them. Such being the case, there is little danger of excessive rates being fixed. But if, perchance, it should happen, the remedy of the public is by appeal to the rate-fixing body, or, if necessary, by a change in its membership." In Pinney & Boyle Co. v. L. A. Gas Corporation, 168 Cal. 15, it was said, "While the public utilities are bound to render the service or furnish the commodities an individual member of the public is not compelled to accept the service or use the commodity. If he does so it is conclusively held that his act is an acceptance of the rate fixed and he may not thereafter contest the reasonableness of the rate." This appellant does not have the constitutional right to a hearing de novo by this court and its independent judgment as to the reasonableness of the finding of the Public Service Commission. No question of any constitutional right of this appellant is involved, and our revisory powers are such only as we recognized and applied in Mt. Union Boro. v. Mt. Union Water Co., 63 Pa.

Superior Ct. 337, and B. & O. R. R. Co. v. Public Service Commission, 66 Pa. Superior Ct. 403.

The Public Service Company Law authorized common carriers to charge just and reasonable rates, and prohibited unjust, unreasonable or discriminatory exactions. It confided to the Public Service Commission the duty of investigating, holding hearings, at which parties interested should be permitted to submit evidence, and empowered the commission to determine the facts and conditions, in each case, which must control in the fixing of rates to be charged. "The basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public": Smyth v. Ames, supra. "The value of the property is to be determined as of the time when the inquiry is made regarding the rates. If the property which legally enters into the consideration of the question of rates has increased in value since it was acquired, the company is entitled to the benefit of such increase. This is, at any rate, the general rule. We do not say there may not possibly be an exception to it where the property may have increased so enormously in value as to render a rate permitting a reasonable profit upon such increased value unjust to the public": Wilcox v. Consolidated Gas Co., 212 U. S. 19. The Public Service Company Law recognizes these principles and empowered the Public Service Commission to investigate and, after hearing, determine the fair value of the property of any public service company, used and useful for the public service, and to make re-valuations of such property from time to time. The legislature not only authorized such valuations of property, but conferred upon the commission extensive powers in making such investigations and (in article V, section 20) specifically set forth many matters and things having a bearing on such value which it shall be proper for the commission to take into consideration in arriving at

a conclusion, nearly all of which things had been recognized as proper for consideration in various decisions of the Supreme Court of the United States. There can be no question, under the provisions of the act that it was the legislative intention that the commission should determine the present value of the property. The Public Service Commission discharged this duty in the present case in strict compliance with the provisions of the statute; all parties interested were given a patient hearing and the commission gave to their respective contentions full and conscientious consideration. The finding of the commission was that the value of the property of the appellee, used and useful in the public service, was nine million dollars. This is the rate base upon which the commission founded its determination of the rate which the company should be permitted to charge. The facts found support the order made. The appellant challenges the finding of fact, and asks this court to set it aside.

The jurisdiction of this court to set aside a finding of fact by the Public Service Commission, no constitutional question being involved, is dependent on the following provisions of the Public Service Company Law: "Article VI, section 23. In all cases the orders of the commission shall be prima facie evidence of the reasonableness thereof, and the burden of proving the contrary shall be upon the appellant or appellants," etc. "Section 24. If the court shall, upon the record, find that the order appealed from is unreasonable or based upon incompetent evidence materially affecting the determination or order of the commission, or is otherwise not in conformity with law, it may enter a final decree reversing the order of the commission." The burden of proving the finding unreasonable is upon the appellant. The proceedings before the commission having been in strict compliance with the provisions of the statute the determination of the question must turn upon the sufficiency of the evidence to support the finding of the commission. "In cases like

the present the courts will not review the commission's conclusions of fact, by passing upon the credibility of witnesses, or conflicts in the testimony. But the legal effect of evidence is a question of law. A finding without evidence is beyond the power of the commission": Interstate Commerce Commission v. Louisville & Nashville R. R., 227 U. S. 92. "In determining these mixed questions of law and fact, the court confines itself to the ultimate question as to whether the commission acted within its power. It will not consider the expediency or wisdom of the order, or whether, on like testimony, it would have made a similar ruling. 'The findings of the commission are made by law prima facie true, and this court has ascribed to them the strength due to the judgments of a tribunal appointed by law and informed by experience.' ......Its conclusion, of course, is subject to review, but, when supported by evidence is accepted as final; not that its decision, involving, as it does, so many and such vast public interests, can be supported by a mere scintilla of proof......but the courts will not examine the facts further than to determine whether there was substantial evidence to sustain the order": Interstate Commerce Commission v. Union Pacific R. R., 222 U. S. 547. The jurisdiction given to this court is merely to determine whether the order of the commission is unreasonable. The power to ascertain and declare what is a just and reasonable rate is quite different from the authority to determine whether a rate fixed by the commission is unreasonable or unlawful. Whether or not the order is within the field of reasonableness or outside of its boundaries, under the evidence, is the question for the court, which is one quite different from that which was before the commission. When the order is such that reasonable men might well, under the evidence, differ with respect to its correctness, it cannot be said to be unreasonable, within the meaning of the statute. It is within the domain of reason, not outside of its limits. We have deemed it necessary to thus discuss at length the nature

of the jurisdiction which we are called upon to exercise in such cases because of the very able argument presented by counsel for the appellant, orally and in their briefs, in support of their contention that they were entitled to the independent judgment of this court upon the questions of fact. We are of opinion, after mature consideration, that we are without authority to set aside a finding of fact by the Public Service Commission which is supported by substantial evidence, where no constitutional question is involved.

When we come to apply the principles hereinbefore stated to the record and evidence, this case presents no serious difficulty. We have examined with care the voluminous printed record and report of the evidence certified to us by the commission, and are not convinced that the finding of the commission was without substantial competent evidence to support it. There was a conflict of the evidence as to the original cost of construction of the property. The engineering conference submitted a detailed report as to such original cost, finding it to have been $7,899,064.56, which did not include $566,199.52 which had been expended for superseded property. Dr. Snow, the chief engineer of the Public Service Commission, who was a member of the engineering conference, was examined and cross-examined orally and explained the engineering estimate as to the original cost of construction. The appellant, who was complainant below, submitted much evidence, some of which consisted of the opinion of experts, tending to establish that the original cost of the property was only $5,585,333.74. The commission accepted, with some modifications, the report of the engineering conference, of which its chief engineer was a member. It may here be said that there was no satisfactory evidence produced by either of the parties which would enable a court to come to any definite conclusion as to the actual original cost of construction. Some of the subsidiary companies, which had become merged in the Scranton Railway Company, had com-

menced operations over forty years ago, and as to several of them there were no books showing the cost of construction until within a recent period. The engineering conference attempted to fill these blanks by ascertaining what work had been done during the periods for which there were no books in existence, and then applying unit prices as of that date. The witnesses for the appellant who testified as to the original cost of construction attempted to fill the blanks by ascertaining the stocks and bonds which had been issued during that period and estimating the amounts which had been received from the sales of such securities, and investigating all other circumstances and conditions available. The report of the commission states that all this testimony was examined and given such weight as the commission deemed just. The commission, however, recognized the fact that the testimony as to original cost was not wholly satisfactory and could not of itself constitute a satisfactory rate base. These estimates of original cost included nothing for going concern or development value. The city was not a party to the engineering conference and presented no evidence as to the reproduction cost new of the property. It is contended, however, by the appellant that the engineering conference in its report as to such reproduction cost included items which ought not to have been considered and put an extravagant estimate upon others. The engineering conference submitted a report upon the cost of reproduction new of the property, based upon three different unit prices: (1) Prices as of November 1, 1919, (2) average prices for 1914 to 1919 inclusive, and (3) current prices for the year 1914.

This report, concerning the details of which the chief engineer of the Public Service Commission was examined and cross-examined at length, estimated the cost of reproduction of the property new undepreciated, at unit prices of the several dates, respectively, as follows: No. 1, Prices of November 1, 1919, $10,706,975.42, to which amount it added certain items for development cost, or

going concern value amounting to $1,670,689.88, making $12,377,665.30; from which amount it found should be deducted for depreciation $1,219,715.31; thus leaving, upon that basis, a net valuation of $11,157,949.99. No. 2, average prices for 1914 to 1919 inclusive, construction cost $8,207,701.75; for development of business $1,495,-740.75; making $9,703,442.50, from which was to be deducted for accrued depreciation $913,648.35; thus leaving a net valuation, upon this basis, of $8,789,794.15. No. 3, unit prices of 1914, cost of construction $6,721,-212.05; adding for development cost, $1,391,686.47; making $8,112,898.52, from which there should be deducted for accrued depreciation $726,851.17; thus leaving a net valuation, upon that basis, of $7,386,047.35.

The appellant complains that the valuation of land, in the report of the engineers upon reproduction cost, is too high. The valuation of this land, upon the several bases of reproduction cost, above set forth, was as follows: No. 1, $243,783.50; No. 2, $195,026.80; and No. 3, $182,-337.63. The appellant contended that such valuation should be, as of the several dates, No. 1, $177,251; No. 2, $141,800.80 and No. 3, $132.938.25. It appeared in evidence that the engineering conference had employed two real estate experts to ascertain the values of the tracts of land used by the respondent in the public service. Those experts differed in their estimates, and the conferees took the average between them. The appellant had notice of who the experts were, and yet did not call them or any other persons to testify as to the value of the land, and now contends in its brief that the engineers should have taken the lowest value placed by either of the experts, upon the land in question. This appellant had full knowledge of the valuation which the engineering conference had put upon the land, and did not see fit to call a single witness to challenge that item of the report. We cannot say, in such circumstances, that the commission ought to have entirely disregarded the report of the engineers. Another matter which the appellant

asserts ought to have been excluded from the report of
the engineers as to reproduction cost was the equipment
of the power station of the company, upon which the
engineers placed a valuation, as of the several dates, as
follows: No. 1, $383,168.60; No. 2, $267,186.02, and No.
3, $218,433.78.   The contention of the appellant is that
as the Scranton Railway Company is now purchasing its
power from the Scranton Electric Company, the power
plant equipment, the building and the land upon which
it stands ought to have been excluded from consideration
by the engineers in placing a valuation upon the property
of the appellee.   The commission found that this prop-
erty was held in reserve by the company and was actually
used for a number of months during the World War, and
in its report states: "Under these circumstances the com-
mission will place some value upon this equipment prop-
erty but will make material revision in the figures
submitted by the conference for this purpose."   The testi-
mony of the engineers certainly warranted a finding
that this property was in condition for use and at the
present time it was proper for the company to hold it in
reserve for an emergency.   A third item included in the
report of the engineering conference related to the build-
ings used by the company, the valuation of which the ap-
pellant asserts was extravagant.   The position which
appellant assumed with regard to this item necessarily
reflected its contention as to the power station equip-
ment.   If the equipment was to be excluded from the
valuation, the building which contained that equipment
must also be excluded.   The engineers estimated the
reproduction cost of the buildings, as of November 1,
1919, at $558,397.05.   The appellant contends that the
cost of the buildings, as of that date, should have been
fixed at $407.020.03.   The value of the power plant build-
ing accounts within a few thousand dollars for this en-
tire difference.   The testimony of the engineers was suf-
ficient to sustain a finding that the value of the building
and equipment was proper to be considered in deter-

mining the total value of the property used in the public service. The report of the engineers included an allowance of $50,668.06 not included in the inventory of property owned by the railway company. The evidence disclosed that this allowance was for expenditures which had been made by the company in relocating a creek, constructing sewers, special grading from curb to curb required by ordinances of municipal authorities, damages to abutting property from such grading and other items of like character. It was entirely proper for the engineers to include these items in their estimate of reproduction cost. It is impossible to include in this opinion a review of the evidence upon which the Public Service Commission was called to pass in this proceeding. We deem the foregoing brief summary of the evidence sufficient, to show that there was substantial evidence to sustain the finding of the commission.

The commission did not accept in its entirety the report of the engineers as to the reproduction cost of the property, but reached the conclusion that the reproduction cost new, exclusive of going concern value and accrued depreciation, as of the several dates, should be fixed as follows: As of November 1, 1919, at $10,075,000; as of unit process for the period 1914 to 1919 inclusive, at $7,000,000; and under 1914 prices at $6,300,000. The commission found that in each instance the amounts found for depreciation by the report of the engineers should be deducted from these figures. It is important here to observe that the Public Service Commission, in arriving at the conclusion that the reproduction cost, as of the several dates, should be fixed in the amounts above stated, expressly excluded any allowance for brokerage, or the cost of financing the construction. Since this finding by the commission the Supreme Court has expressly decided that a reasonable brokerage, paid in marketing the bonds of a utility company, for the purpose of obtaining money to construct its plant, should be allowed as a principal item, in determining the value of

its property: Ben Avon Boro. v. Ohio Valley Water Co., 271 Pa. 346. The engineering conference report, and the testimony of the engineers, was sufficient to support a finding that the usual cost of financing, or brokerage, in the present case, as of the several dates, would have been as follows: November 1, 1919, $509,855.97; 1914 to 1919 inclusive, $390,842.94, and 1914, $320,070.68. This was the only testimony in the case upon this particular point. The appellant received the benefit of this error upon the part of the commission. This exclusion of the cost of financing which might properly have been included in arriving at a correct conclusion as to the valuation of the property of the railway company, would certainly go far towards balancing the alleged errors of which the appellant complains. The Public Service Commission did not in its finding fix any definite amount which it allowed for going concern value, but stated in its report that it would in its determination of the fair value of respondent's property allow such a sum for that purpose "as will appear in its judgment to be warranted under the record and evidence." The only evidence as to going concern value in the case was that of the engineers. The commission having found, upon sufficient evidence, that the cost of reproduction of the plant of the railway company, as of prices prevailing in November, 1919, would have been $10,075,000, and that depreciation amounted to $1,219,715.31, we thus have a construction cost, less depreciation, of $8,855,284.69. If to this be added the cost of financing, which the engineers found should be allowed we have a valuation of over $9,350,000 without any allowance for going concern value. If to the amount thus ascertained we add one-half of the amount which the engineers testified should be allowed for going concern value we would have a valuation of over $10,000,000. It is argued that the prices prevailing in 1919 were abnormal. That may be possible, but to what extent they are abnormal we cannot say, under the evidence in this case, with that certainty which ought to characterize

judicial action. Furthermore, the commission did not fix the valuation of the company's property at $10,000,-000, nor did it base its findings upon the unit prices prevailing in 1919. Should prices hereafter decline more rapidly than they have since 1919 it may be that there should be a re-valuation of the property here involved, and the statute authorizes that to be done. We are not convinced, after a thorough examination of the evidence and record in this case, that the finding of the Public Service Commission was without substantial evidence to support it.

The appellant argues that even if the valuation of the property of the railway company is sustained, the rates of fare fixed by the final order of the commission will produce a revenue in excess of a reasonable return upon the property of the appellee used in the public service. The argument on this branch of the case depends upon the assumption that there will be a very considerable increase in travel after people get used to paying the eight-cent fare, and that the revenues of the company will thus be greatly increased. This is largely a matter of speculation and theory; and we would not be warranted in placing upon a foundation so insecure a decision that the determination of the Public Service Commission is unreasonable and not in conformity with law.

The order of the Public Service Commission is affirmed and the appeal dismissed at cost of the appellant.

Linn, J., did not sit and took no part in this decision.