## Pittsburgh, Appellant, v. Pennsylvania Public Utility Commission.

Argued October 2, 1956.  Before RHODES, P.J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

554

*J. Frank McKenna, Jr.,* City Solicitor, with him *David Stahl,* Assistant City Solicitor, for City of Pittsburgh.

*Jack F. Aschinger,* Assistant Counsel, with him *Albert E. Luttrell, William A. Donaher* and *Owen B. McManus,* Assistant Counsel, and *Thomas M. Kerrigan,* Acting Counsel, for Pennsylvania Public Utility Commission.

*Paul H. Rhoads,* with him *John P. Egan, Jr., William Anderson, Jr., Howell C. Mette, Walter W. Shearer,* and *Rhoads, Sinon & Reader,* for Manufacturers Light & Heat Company.

OPINION BY RHODES, P.J., December 28, 1956:

This is the second rate proceeding instituted by The Manufacturers Light and Heat Company within a pe-

riod of fifteen months.[1] On December 30, 1954, Manufacturers filed four tariff supplements providing for increases in rates for general service and industrial service in Pennsylvania. To Tariff—Gas Pa. P. U. C. No. 37, applicable to general service and industrial service customers other than Lukens Steel Company, supplements 12 and 13 were filed. Supplement 12, to be effective March 4, 1955, proposed an increase in total revenue of $585,063; supplement 13, to be effective March 5, 1955, proposed an increase of $3,629,149. To Tariff—Gas Pa. P. U. C. No. 38, applicable only to Lukens Steel Company, supplements 5 and 6 were filed. Supplement 5, to be effective March 4, 1955, proposed an increase in revenue of $44,816; supplement 6, to be effective March 5, 1955, proposed an increase of $121,764. The total proposed increases were $4,380,792, or 10.74 per cent of the total annual gas operating revenues in Pennsylvania of $40,791,478 at the level of operations of October 31, 1954. On February 28, 1955, the commission suspended operation of the supplements for a period of six months, and on its own motions instituted investigations to determine the fairness, reasonableness, justness, and lawfulness of the proposed rates and charges as well as the then existing rates and charges. The operation of the proposed supplements was thereafter further suspended to December 4 and 5, 1955. Thirty-nine complaints were filed by municipalities and private corporations, one of

---

[1] On October 7 and 8, 1953, supplemental tariffs were filed by Manufacturers for an increase in total revenues of over $5,800,000. The commission allowed about $2,900,000, but on November 13, 1956, in *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 395, 126 A. 2d 777, we held that the evidence would support an increase of approximately $2,600,000. The present proceeding was begun while the appeal in the prior proceeding was still pending before this Court.

which was subsequently withdrawn. Extended hearings were held; the printed record in this Court, including the exhibits, contains 1,829 pages.

On January 3, 1956, the commission by its order disposed of all proceedings, and granted an over-all annual increase of $3,015,697 instead of the $4,398,061 requested by the utility as adjusted. Appeals were filed by the City of Pittsburgh (Nos. 57 and 58, April Term, 1956), and The Manufacturers Light and Heat Company (Nos. 64 to 103, April Term, 1956). The City of Pittsburgh and The Manufacturers Light and Heat Company were permitted to intervene as appellees in the appeals of each other, and the Lukens Steel Company was permitted to intervene as an appellee in the appeals of the City of Pittsburgh. We will dispose of all the questions involved in the several appeals in this opinion.

The City of Pittsburgh presents six questions: (1) Did the commission err in calculating accrued depreciation and depletion on the basis of a reserve requirement study instead of accepting the utility's book reserve; (2) did the commission err in the manner in which it annualized and adjusted revenues and expenses for customer changes during the test year; (3) did the commission err in rejecting the city's adjustment to demand charges for gas purchased from United Fuel Gas Company; (4) did the commission err in rejecting the city's adjustment for changes in the utility's curtailment policy effective after the test year; (5) does the record support a rate of return of 6.5 per cent; and (6) is the rate structure free from unreasonable and unlawful discrimination.

Manufacturers presents two questions which relate to the allowance made by the commission for annual federal income tax: (1) Did the commission err in re-

fusing to permit the utility to retain the benefits of accelerated depreciation under section 167 of the Internal Revenue Code of 1954, and (2) did the commission err in computing the tax allowance on the basis of the consolidated return filed by Columbia Gas System, Inc., and its subsidiaries, including Manufacturers.

ACCRUED DEPRECIATION AND DEPLETION. The fair value of the utility's property used and useful in the public service allocated to retail sales in Pennsylvania was found by the commission to be $90,000,000 at the level of operations of October 31, 1954.[2] In arriving at fair value, the commission considered evidence of original cost and original cost trended to average price levels of 1953 and of the two, three, and five-year periods prior to 1954.[3] The amounts for accrued depreciation and depletion which were deducted from the measures of value were determined from a reserve requirement study prepared by the utility at the request of the commission. The utility also submitted evidence of its book reserve for accrued depreciation and depletion, but the commission found the book reserve to be unreliable for several reasons and rejected it. The amount of accrued depreciation and depletion in the book reserve was greater than that shown by the reserve requirement study. The acceptance of the book reserve would have had the effect of reducing the rate

---

[2] In the prior rate proceeding the finding of fair value at July 31, 1953, was $80,000,000. *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 53, 112 A. 2d 826.

[3] The measures of value after deduction for accrued depreciation and depletion were found by the commission to be: Original cost, $71,511,630; original cost trended to average price level of 1953, $115,523,121, to average price level of 1952-1953, $110,809,840, to average price level of 1951-1953, $108,331,603, to average price level of 1949-1953, $102,660,026.

558

base and consequently the amount of allowable return. However, since both accrued depreciation and depletion and annual depreciation and depletion must be calculated on a reasonably consistent basis, the acceptance of the book reserve would also have resulted in a higher allowance for annual depreciation and depletion. *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 58, 112 A. 2d 826. The city contends that the commission erred in using the reserve requirement study and in rejecting the book reserve. This same contention was before us in the prior rate proceeding, and we sustained the commission in rejecting the book reserve. *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 178 Pa. Superior Ct. 46, 57, 112 A. 2d 826. The same reasons given for the rejection in that case were applied to the present rate proceeding. In discussing this matter in the prior case, we said (page 57 of 178 Pa. Superior Ct., page 831 of 112 A. 2d ) : ". . . the commission, within the sphere of its authority, could have accepted the utility's book reserve if convinced of its reliability and accuracy. The commission is not bound to accept any particular method in estimating accrued depreciation and depletion which are essentially judgment figures, and if based on substantial evidence are binding on appellate review. . . . But in so determining accrued depreciation and depletion the book reserve is by no means conclusive and may be inaccurate. . . . The fact that the book reserve showed a higher or lower amount than the reserve requirement study has no effect on the principles applicable to such administrative finding." The city urges us to review our previous determination of this issue because it believes that the decision of our Supreme Court in *Berner v. Pennsylvania Public Utility Commission*, 382 Pa. 622, 116 A. 2d 738,

declaring that the affirmative burden of supporting a rate increase is, by statute, on the utility, changes the legal principles which we applied in the prior case. The city also argues that the record in the present proceeding does not support our conclusion.

The principles applicable in the prior case are not in conflict with any pronouncement in the *Berner* case. [Of course the burden of sustaining the reasonableness of rates shall be upon the public utility. See section 312 of the Public Utility Law of May 28, 1937, P. L. 1053, 66 PS §1152.] Here the utility initially met its burden with respect to accrued depreciation and depletion when it submitted in evidence its book reserve. When the commission found this to be inaccurate and unreliable it was not obliged to modify or adjust the book reserve without some further and acceptable evidence. The commission had the power to require the utility to prepare a reserve requirement study. In preparing and submitting such study to the commission the utility was acting in furtherance of its burden of proof. We did not say or imply in the prior case (*Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 178 Pa. Superior Ct. 46, 55, 112 A. 2d 826), that the affirmative burden was upon complainants to show that the excess of the book reserve over the reserve requirement was genuine, as the city contends. We said merely that the commission was not required to find that the excess was genuine, in view of the historical background of the book reserve and the methods by which it was computed and modified by the utility throughout the years. Although the city might have submitted evidence of the reliability of the book reserve, which the commission could have considered in weighing the reserve requirement study, there was no duty upon the city to submit such evidence. The commis-

sion acted within its fact-finding capacity as to the validity of the book reserve, and its determination on the facts was permissible.

Consequently, we find no merit in the city's contention that on this record the commission was bound to accept the book reserve. The evidence of the historical background of the book reserve in this proceeding, as in the prior case, begins with its inception in 1910. The various revisions and changes in method employed through the intervening years which made it unreliable in the prior case are the same here. Naturally the same result follows. The use of an amount of accrued depreciation and depletion lower than the book reserve does not necessarily establish capital contributions by customers for property now included in the rate base. See *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 178 Pa. Superior Ct. 46, 56, 112 A. 2d 826. We find no failure on the part of the commission to give proper weight to the evidence in this respect.

ANNUALIZATION AND ADJUSTMENT OF REVENUES AND EXPENSES FOR TEST YEAR CUSTOMER CHANGES. The city next attacks the commission's annualization and adjustment of revenues and expenses for test year customer changes. The commission has a wide area of discretion with respect to the extent and type of adjustments which it will make to test year data providing there is substantial evidence in the record warranting its action. *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 62, 69, 70, 99 A. 2d 61. In determining whether adjustments are to be made, the commission is not bound to accept or reject any particular evidence or to make any specific adjustments. If the commission acts properly within the sphere of its authority as a fact-finding body, its action will not be disturbed. *Pittsburgh v.*

*Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 61, 112 A. 2d 826.

The commission found that during the test year the number of base load residential customers in Pennsylvania decreased 10,246, but that the number of residential heating customers increased 12,611, or a net increase of 2,365. The number of base load commercial customers was found to have decreased 1,344, but the number of commercial heating customers increased 1,615, or a net increase of 271. The evidence relating to the annualized revenues and expenses resulting from these changes as submitted by the utility and the city, and the ultimate findings of the commission in this respect are set forth in the following table:

|  | *Utility* | *City* | *Commission* |
|---|---|---|---|
| Operating Revenue Increase | $1,102,155 | $1,673,432 | $1,338,024 |
| Operating Expense Increase | $ 609,079 | $ 604,233 | $ 738,704 |

With respect to the increase in revenue, the commission found that the utility's evidence was erroneous and rejected it. The city's evidence was held to be correct in principle but defective mechanically. The commission adjusted the city's figures to eliminate consideration of certain customers added after the test year. The city contends that the use of the number of customers after the test year was proper in the method which it used to calculate the average number of customers at the end of the test year. Its own witness, however, testified that the method was not intended to be mathematically precise but would "represent very closely" the number of customers on the lines at the end of the test year.

In fixing the incremental expense necessary to serve these customers, the commission considered the evi-

dence of the city that the operating cost ratio would be 39.27 per cent, and the evidence of the utility that the cost ratio would be 78 per cent. The commission rejected the city's estimate as too low because it failed to consider the necessary increases in expenses such as production purchases, storage, transmission, accounting, distribution, and administration. The commission then adjusted the utility's figure of 78 per cent downward to a judgment figure of 60 per cent as more realistic. Although adversely affected the utility accepted the adjustment. The evidence of the utility might have supported a higher ratio. We find no error under the circumstances.

ALLOWANCE FOR GAS PURCHASED FROM THE UNITED FUEL GAS COMPANY. The city attempts to establish that the commission erred in failing to make adjustments to demand charges for gas purchased from the United Fuel Gas Company, which is mentioned as an affiliate. During the test year the utility purchased gas from United, and claimed an allowance as a recurring expense in the amount actually paid for these purchases. The commission allowed the actual billing demand experienced by the utility during the test year. The city argues that the commission should have made a downward revision because the city's evidence, based upon a theoretical demand charge, showed that the cost would be lower. The evidence presented by the utility indicated that the actual billing was properly considered, and that the adjustment proposed by the city was not in effect during the test year or applicable any time after the test year. Furthermore, while the city would have adjusted the demand charges downward in this instance, it would not make an adjustment upward for other gas purchases which had increased. The use of actual expenses was proper un-

less there is factual evidence which indicates to the commission that an adjustment should be made or unless a burden of proof has not been met. The commission did not accept the evidence of the city as persuasive, and we are unable to find any error in this respect. The suggested adjustments were: (1) Change in demand charge, $183,418 applicable to Pennsylvania retail sales; (2) proposed gas purchases from United at 100 per cent load factor, $332,846 applicable to Pennsylvania retail sales.

In connection with the purchases from United, the city also argues that the commission erred in failing to adjust the allowance on the further basis that the utility could purchase the gas at a 100 per cent load factor. The utility's evidence indicated that if purchases were made from United at 100 per cent load factor the utility's own production would have to be curtailed, and that the result would be a greater expense rather than a saving. In disposing of the city's contention the commission recognized that the city had failed to consider the material changes which would follow in the utility's own production with an ultimate increase in expense.

ADJUSTMENT FOR CHANGES IN CURTAILMENT POLICY AFTER THE TEST YEAR. It is a further contention of the city that the commission erred in rejecting its proposed modification of revenues for changes in the utility's curtailment policy made after the test year. During the test year, as in prior years, the utility followed a policy of maintaining its plant capacity to be able to meet the gas requirements of all customers on peak days of minus 3° F., and to curtail industrial users on colder days. A shortage of gas in the test year precluded the utility from meeting this goal. Since the mean temperature on the coldest day in the test year

was plus 13° F., the utility, early in 1955, decided to change its curtailment policy to meet the peak demands of all customers at plus 5° F.[4] The city asserted that the curtailment of industrial customers at a higher temperature would result in more gas being available for more remunerative classes of customers, and that the utility would therefore have an increase in revenue. The commission rejected the proposed adjustment because the changes were too remote and additional plant, distribution, storage facilities, and operating expenses incident to this change, effective a year and a half after the end of the test year, were as yet unpredictable. The city itself recognizes that the amount of the adjustment could not be precisely determined. While the commission may not be oblivious to evidence relating to changes occurring after the test year when they substantially affect the rate proceeding (*City of Pittsburgh v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 187, 209, 90 A. 2d 607), such evidence may be rejected when the changes are remote or would have the effect of distorting test year data (*Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 178 Pa. Superior Ct. 46, 65, 66, 112 A. 2d 826).

RATE OF RETURN. In the present rate proceeding, as in the prior one, the commission allowed a rate of return of 6.5 per cent. Based upon a capital structure of 50-52 per cent debt and 50-48 per cent common equity capital, the commission found the composite cost of capital within the range of 6.19 to 6.30 per cent.[5]

---

[4] Minus 3° F. has a frequency of occurrence of once in ten years; plus 5° F. has a frequency occurrence of about once each year.

[5] The actual capital structure of Columbia Gas System, Inc., at December 31, 1954, was 52 per cent senior debt, 9 per cent sub-

The utility claimed an allowance above the cost of capital of .25 to .50 per cent to provide for the uncertainties of future financing and for protection against the attrition of earnings. The commission properly rejected attrition of earnings as supporting any such allowance because the factors involved were reflected in the cost of capital and in the allowance for operating expenses. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 388, 126 A. 2d 777. The commission, however, did allow .20 per cent above the cost of capital "for possible future adverse fluctuations in general market levels, . . . [and] for any adverse deviation from recent typical market conditions that might be experienced by Columbia System or respondent in actually obtaining capital." The reasons given by the commission for the allowance are substantially the same as those given in the prior rate proceeding which this Court fully discussed and found insufficient in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 381, 126 A. 2d 777. The rate of return must be determined from the substantial evidence, and there may not be a dual allowance for the same factors. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 71, 112 A. 2d 826. We have examined the present record and find again that there is no substantial evidence to support the allowance. There was some evidence of a rise in the cost of debt capital which the commission considered in determining the cost to Columbia. In the prior rate proceeding

---

ordinated debentures convertible into common stock which the commission treated as equity, and 39 per cent common stock. The cost of capital to Columbia was applied to The Manufacturers Light and Heat Company as it is a wholly owned subsidiary. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 381, 126 A. 2d 777.

the cost of debt capital was found to be 3.35 per cent; the commission found it to be 3.60 per cent in this proceeding. The commission concluded that ". . . [its] finding of 3.60 per cent for current replacement cost of debt is ample to service the existing commitments and attract new debt money on reasonable current terms." Having once given consideration to the rise in the debt capital market, the commission could not thereafter give it further consideration to support an allowance above the cost of capital. Concerning future market conditions there was no evidence that they would be adverse. F. H. Crissman, treasurer of Columbia Gas System, Inc., again testified that market conditions were "generally good," but that they "could change." With respect to equity capital another utility witness testified that conditions had "improved somewhat." In fact, since the cost had decreased, the commission found the cost of equity capital in this proceeding to be 9 per cent, whereas it had been found to be 9.25 per cent in the prior rate case. The commission, having found the applicable cost of equity capital to be 9 per cent, could not render this downward revision ineffectual by making an upward allowance for unpredictable future changes in such cost.

It is argued on behalf of the utility that its experience in the recent past has indicated that it cannot obtain capital at the cost found by the commission. The commission considered the contention and found that the recent experience was in the nature of spot costs which were not typical or representative of current costs for rate purposes. The utility's evidence also indicated that the recent higher cost was unusual, and that "extreme care" must be exercised in the use of spot prices. Moreover, such matters relate to the cost of capital and they were properly considered therein.

The fact that the commission might have found the cost of capital to be higher is no justification for making an additional allowance above the cost of capital. To do so renders the finding of cost of capital a useless figure.

In concluding that the allowance was proper, the commission made this additional comment: ". . . a slight allowance above bare cost of capital, as determined herein, will tend to produce a healthier public utility which, as such, will be better able to meet the service demands of the consuming public at a very small additional cost to the latter." The commission does not elaborate upon this "healthier public utility" concept. However, as a matter of fact, the evidence indicates that because of the good credit standing of Columbia it has obtained debt capital at prevailing prime rates, and that in issuing stock it has "done as well, if not better, than other natural gas companies." The test is not how much income the utility can be allowed at very small added cost to each of its customers, but whether its rates are fair and reasonable. A gratuity to a utility at the expense of its customers cannot be sustained without substantial evidence and good reason to support it. We conclude therefore that the record before us does not support a rate of return in excess of 6.30 per cent.

RATE STRUCTURE. Our conclusion concerning the rate of return renders the present rate structure ineffectual as a practical matter as it was designed to produce a return of 6.50 per cent.[6]

---

[6] The rate schedules in the prior rate proceeding became effective on September 7, 1954. *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 66, 112 A. 2d 826. On November 13, 1956, by our opinion we ordered refunds under those schedules as the rate of return was held to be excessive. *Pitts-*

In this rate proceeding, as at the remand hearing in the prior rate case (see *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 126 A. 2d 777), the utility presented evidence as to the manner in which it determined the rates for the various blocks. The rate structure was again divided into seven consumption blocks on the basis of volume of gas consumed. Testimony on the facts considered by the utility in arriving at the rate structure was presented, and there was a detailed factual discussion of each rate block. The commission made an exhaustive review of the evidence. As we discussed the various factors and the manner in which the rate structure was determined in our prior decision, we will not repeat what we have said. See *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 126 A. 2d 777. For the present it suffices to say

---

*burgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 376, 395, 126 A. 2d 777. The proposed rates filed in the instant proceeding were to become effective on March 4 and 5, 1955, but because of the suspensions by the commission they did not become effective until December 4 and 5, 1955, by operation of law. The commission's order, however, was not filed until January 3, 1956, and as it did not allow the full increase requested by the utility the order directed that a tariff with new rate schedules be filed on or before January 20, 1956, and tariffs Nos. 37 and 38 canceled. Meanwhile, from December 4 and 5, 1955, to January 20, 1956, the utility charged rates based upon the original higher schedules, and the commission in its order of January 3, 1956, found that approximately $250,000 had been collected in that period in excess of the increase allowed. No refunds were ordered because the commission concluded that the amount was too small in view of the expense involved to calculate and make refunds, and because the utility had suffered a loss during the suspension period. Propriety of this portion of the commission's order is not raised in these appeals, and has not been considered by this Court. See *Equitable Gas Company v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 450, 102 A. 2d 235.

that the evidence sustains the general method used in designing the rate structure.

FEDERAL INCOME TAX. The commission allowed the utility $4,107,000 for federal income taxes under rates permitted by its order. The utility charges that the commission erred in two respects: (1) In failing to allow the utility to retain the benefits resulting from its use of accelerated depreciation under section 167 of the Internal Revenue Code of 1954, 26 U.S.C.A. §167; and (2) in failing to allow the utility to retain the tax saving resulting from the filing of a consolidated tax return by Columbia Gas System, Inc., and its subsidiaries.

(1) Accelerated depreciation. Accelerated depreciation is descriptive of certain methods of computing the annual allowable depreciation deduction for federal income tax purposes. Under section 167 (a) of the Internal Revenue Code of 1954, a taxpayer may deduct a "reasonable allowance" for depreciation. "Reasonable allowance" is defined in section 167 (b) as any one of three specific methods—straight line, declining balance, sum of the years-digits—or "any other consistent method." The straight line is the normal method, the depreciation deduction being the same for each year of the life of the property. The accelerated methods provide a greater deduction in the early years of the life of the property than the straight line method, but a lesser deduction in the later years. Under the 1954 Code, 167 (c), accelerated depreciation may be used for property constructed or acquired after December 31, 1953.

The utility elected to take "declining balance" depreciation, an accelerated method, with the result that its depreciation allowance for tax purposes for the test year 1954 amounted to $32,288 more than it would

have been by the straight line method. This reduced its tax liability by $17,528. The utility claims that this tax saving or deferral should be retained by it. The utility would "normalize" the effect of this saving or deferral by computing the tax allowance for rate purposes as though the method of depreciation had been straight line instead of the accelerated tax depreciation actually used. As no great amount of property was constructed or acquired after December 31, 1953, during the test year 1954, the benefit of this accelerated depreciation was relatively small. However, all construction and acquisitions henceforth may be depreciated under the declining balance method with commensurate increases in the amounts saved or deferred in the immediate future. The declining balance method permits a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the straight line method.

The commission rejected the utility's proposed "normalization," and computed the allowance for taxes on the basis of the actual tax which would be paid. The utility says this was error for two principal reasons: (1) Congress intended as a matter of law that these cash tax benefits be retained by the utility for expansion, modernization, and working capital to finance its development, thereby promoting the national economy; and (2) the commission's action will result in unjust discrimination in favor of the present customers whose rates will be lower because of the lower tax in the early years of the property life and against future customers whose rates will be computed in the later years when the depreciation deduction is lower and the tax higher. There are several other contentions raised which relate to these two primary ones; they will be considered in the proper context rather than individually.

We think it is obvious at once that Congress did not intend as a matter of law that these tax benefits be retained by regulated utilities. In the first place, it should be noted that the 1954 Code provision is general, and relates to all taxpayers and not merely to utilities. It is a part of the general revision of the Internal Revenue Code of 1939 which Congress enacted in 1954. Under the 1939 Code, a taxpayer was entitled to a "reasonable allowance" for depreciation (26 U.S.C.A., 1939 Code, 23 (L)), but there was no further definition of the term, and no specific methods were mentioned. The method most widely used was the straight line method, but accelerated methods were available if the taxpayer could show that they were in accord with the realities of the use and consumption of the particular property involved.[7] The 1954 Code

---

[7] Regulation 39.23 (L)-5 under the 1939 Code provides: "The capital sum to be recovered shall be charged off over the useful life of the property, either in equal annual installments or in accordance with any other recognized trade practice, such as an apportionment of the capital sum over units of production. Whatever plan or method of apportionment is adopted must be reasonable and must have due regard to operating conditions during the taxable period." U. S. Code Congressional and Administrative News, Federal Tax Regulations, 1954, p. 127. The burden of sustaining the depreciation deduction was upon the taxpayer. *Pittsburgh Hotels Co. v. Commissioner of Internal Revenue*, 43 F. 2d 345. It was somewhat difficult to sustain if the deduction claimed was greater than normal depreciation. Cf. *Turchin v. Commissioner of Internal Revenue*, 16 T. C. 1183, 1190-1194. When it enacted the 1954 Code, Congress recognized the prior availability of accelerated depreciation, though restricted and difficult in practical application, and expressed the desire to make it more readily available. Whereas under the prior law the taxpayer was limited in using the declining balance method to 150 per cent of the corresponding straight line rate, the 1954 Code allows depreciation by the declining balance method at twice the appropriate straight line rate. U. S. Code Congressional and Administrative News, 1954, vol. 3, House Report, pp. 4046, 4047, 4048.

did not prescribe accelerated depreciation as a new method in addition to those previously in effect, but rather retained the basic provision that a "reasonable allowance" could be deducted, and specifically defined it to include the accelerated methods in a less restricted form. The 1954 Code simply clarified the prior law, made it more practical in administration, and liberalized the prior accelerated methods to some degree. There is no other specific purpose or object expressed or implied in the Code itself. An examination of the Congressional Reports, particularly that of the House Committee, indicates that this clarification was intended, and that there were several other results which would flow from a more specific and more liberal provision. Briefly, these results were: (1) To eliminate controversy over what is a "reasonable" depreciation allowance; (2) to encourage plant investment, particularly in "risky commitments in fixed assets"; (3) to stimulate the national economy and aid small businesses and farmers in particular, who are "especially dependent on their current earnings or short-term loans to obtain funds for expansion"; and (4) to allow faster tax depreciation in the earlier years of property life "more in accord with the actual pattern of loss of economic usefulness." U. S. Code Congressional and Administrative News, 1954, vol. 3, House Report, p. 4046 et seq.; Senate Report, p. 4655 et seq. The commission noted the stated objects and concluded that "Congress allowed liberalized depreciation to all business enterprises but obviously its principal purposes are not particularly applicable to regulated public utilities whose price of product is 'cost of service.' "

Counsel for the utility refers to excerpts from statements in the House Report, and apparently argues that they are indicative of a congressional intention that the

funds saved by reason of accelerated depreciation must, as a matter of law, be used by industry for expansion and modernization. The statements largely relied upon are these: "Comparatively slow rates of write-off tend to discourage replacement of obsolete equipment and the installation of modern, up-to-date machinery. . . . More liberal depreciation allowances are anticipated to have far-reaching economic effects. . . . The faster tax write-offs would increase available working capital and materially aid growing businesses in the financing of their expansion. For all segments of the American economy, liberalized depreciation policies should assist modernization and expansion of industrial capacity, with resulting economic growth, increased production, and a higher standard of living." U. S. Code Congressional and Administrative News, 1954, vol. 3, pp. 4047, 4048. This language, which is in the House Report and not in the 1954 Code itself, while indicative of the fact that Congress recognized the probable general effect of liberalizing depreciation, does not carry any intention to make this a mandatory method of providing funds for expansion or any intention to require that the funds saved be spent for expansion and for no other purpose. Congress merely says that by making more money available to growing businesses they will probably be induced to spend it on expansion which in turn should increase production and hence better the standard of living. Counsel asserts that, since utilities are an important segment of the national economy, they must likewise benefit. The weakness in this assertion is in failing to recognize the distinct nature of a utility as a regulated quasi-monopoly. As such it may obtain funds for modernization and expansion at the current reasonable cost, and it is allowed to pass this cost on to its customers in an annual de-

preciation allowance and in its annual allowable net return as well. In fixing the rate of return the commission takes cognizance of the cost of capital to the utility. It appears therefore that this general desire of Congress to provide working capital and funds for modernization and expansion is, and has been for many years, adequately met for public utilities through rate proceedings. Utilities are not confronted with the same problem in raising funds for necessary expansion as other businesses. Every public utility shall furnish adequate and reasonable service to the public, and it is allowed to charge such just and reasonable rates as will enable it to properly function.

That Congress did not intend these provisions to have the force of mandatory allowances to utilities (or to any taxpayer) is also apparent from the fact that section 167 (b) merely gives the option to the taxpayer to use any one of the alternate methods. If this utility elected to use the straight line method in computing depreciation for tax purposes instead of the declining balance method, it would have nullified any benefit which Congress may have intended to confer; but the choice would be its own. The 1954 Code not only gives this option, but in section 167 (e) there is the additional privilege given to the taxpayer to elect to change from an accelerated method to the straight line method at any time as provided therein. Certainly, under these circumstances, it cannot be said that Congress intended to make accelerated depreciation a compulsory means for financing plant expansion and modernization. And, as we have indicated, there is nothing in the 1954 Code or in the Congressional Reports which would require any taxpayer to use the funds saved for expansion or modernization.

It is also argued for the utility, with questionable consistency, that the tax liability is merely deferred when accelerated depreciation is taken; and that the amounts saved in the early years should be placed in a reserve to pay future taxes. In considering this approach the commission noted that whether there is or is not an actual tax saving or deferral depends upon the amount of new plant construction in 1954 and future years; and that, assuming the utility will add no additional plant after the test year, its actual tax liability relating to property presently being depreciated under the accelerated method will not be higher than under the straight line method for the next seventeen years. Even under this extreme theoretical assumption it is impossible to say at this time what the taxes for this utility will be seventeen years from now. Although the depreciation deduction for any particular piece of property may be predicted and projected into the future, the tax which will be imposed cannot be determined. Taxes in future years will depend not only upon the amount of depreciation allowed, but upon other factors such as the gross income, expenses of operation, and the tax rate. This contention of the utility erroneously assumes that these factors will remain constant. Congress also recognized that it is the timing of the depreciation which is affected, not the timing of the tax. The House Report indicates the uncertainty of predicting the effect on future taxes: "The changes made by your committee's bill merely affect the timing and not the ultimate amount of depreciation deductions with respect to a property. No accurate estimate can be made of the cost of this provision even in the early years of its application because of uncertainty concerning the extent to which the new declining-balance formula will be adopted and because

of the difficulty in allowing for the effects of the increased investment resulting from the provision upon tax revenues. If there were no stimulus to investment and all eligible taxpayers adopted the new formula, the loss in the fiscal year 1955 would be about $375 million. In the second and immediately subsequent years there would be greater losses if the effect on investment were ignored but it is highly likely that by that time the stimulus which the new formula brings will have produced a volume of additional investment and taxable income which will result in there being no net revenue loss under this provision." U. S. Code Congressional and Administrative News, 1954, vol. 3, pp. 4049, 4050. It is obvious that, although the timing of the depreciation is changed with respect to any one piece of property, it is impossible to say what the effect will be upon future taxes. This statement of the House Committee also makes it clear that there was no intention that the tax saving be mandatory with respect to plant expansion and modernization. The tax liability is reduced in the year the deduction is taken, and Congress merely predicts that the saving will be used for expansion which will produce increased earnings and thus bring greater tax revenue in later years. There is nothing to require any taxpayer to apply the saving to plant expansion. The amount saved may very well be used to pay dividends or for any purpose other than expansion. The utility indicates that it would create a reserve fund from such savings for future taxes. If it were so earmarked it should not be expended for another purpose, but there is no practical means for supervising such a fund.

The utility further contends that the action of the commission in failing to normalize the tax is unconstitutional. To have any possible validity this argu-

ment would first depend upon the existence of a congressional intent to benefit the utility as a matter of law, which is obviously lacking. The utility, however, states that the provision relating to accelerated depreciation was a proper exercise of the power of the Federal Government to impose taxes, which is supreme; and that a state or its agency may not impede the exercise of this power. This rule of law, stated in the abstract, is of course generally correct, but it has no application to the present situation. The action of the commission here does not impede the Federal Government in the collection of its taxes, either directly or indirectly. The utility is not prohibited from using any of the methods set forth in section 167 of the 1954 Code; that is a matter between the taxpayer and the Federal Government. Actually the discretion to use or not to use accelerated depreciation under the 1954 Code is solely with the utility as a taxpayer. The Pennsylvania Public Utility Commission, however, does exercise control over the amount which it will allow the utility for taxes for rate purposes the same as it does over any other annual allowance for expenses. Here the commission has properly allowed the federal income taxes based upon the actual taxes paid. In *Chambersburg Gas Company v. Public Service Commission,* 116 Pa. Superior Ct. 196, 223, 176 A. 794, 805, this Court said: "In fixing rates and setting up a tariff prescribing the rates which the company should receive, it is required that allowance be made for income tax paid: Galveston Electric Co. v. Galveston, 258 U. S. 388 [42 S. Ct. 351, 66 L. Ed. 678]; Georgia Ry. v. R. R. Comm., supra [262 U. S. 625, 43 S. Ct. 680, 67 L. Ed. 1144]; Bangor Water Co. v. P. S. C., 82 Pa. Superior Ct. 48; City of York v. P. S. C., supra [85 Pa. Superior Ct. 139]." In the *Chambersburg* case the

utility had also claimed an allowance for taxes for the year 1932, although no taxes were paid in that year; and this Court said (page 224 of 116 Pa. Superior Ct., page 805 of 176 A.): "The commission in 1932 very properly held that the utility was not entitled to an allowance on account of a tax which it had not been called upon to pay and which there was then no evidence that it would be required to pay." Our statement is applicable to the present situation, where the utility has not been called upon to pay the tax which it saved by reason of the use of accelerated depreciation, and where there is no evidence that it will ever be called upon to do so within the reasonably foreseeable future. In further answer to the constitutional question it may be said that Congress, in enacting section 167 of the Internal Revenue Code of 1954, certainly did not intend to usurp or qualify the commission's delegated authority to regulate public utility rates, which is derived from the police power of the state and is a valid exercise thereof. *Relief Electric Light, Heat and Power Company's Petition*, 63 Pa. Superior Ct. 1, 5, 8; *Great Northern Railway Company v. State of Washington*, 300 U. S. 154, 159, 160, 57 S. Ct. 397, 81 L. Ed. 573, 578. The power of this Commonwealth over intrastate rates of a utility is general and plenary, and its regulation is valid and not violative of due process or equal protection as long as the rates allowed are not unreasonable or confiscatory. *Bell Telephone Company of Pennsylvania v. Pennsylvania Public Utility Commission*, 135 Pa. Superior Ct. 218, 234, 5 A. 2d 410; *Smyth v. Ames*, 169 U. S. 466, 522, 523, 524, 18 S. Ct. 418, 42 L. Ed. 819, 840, 841. See, also, *United Gas Public Service Company v. State of Texas*, 303 U. S. 123, 138, 139, 58 S. Ct. 483, 82 L. Ed. 702, 714. There is no such claim here, and there is no conflict between

any federal legislation and state regulation. The 1954 Code relates to taxation; the commission regulates rates of utilities. They are related only in that the federal income tax which the utility pays is computed on its income from the allowed rates and the rates which the commission allows must provide for the income tax which is paid.

Although the commission was not required to normalize the effect of accelerated depreciation as a matter of law, the issue arises as to whether the commission abused its discretion in failing to make an adjustment for the purported unusual tax liability eventually resulting therefrom. The utility argues that the result of the commission's action is to benefit present customers at the expense of future customers who theoretically will have to pay a higher tax when the depreciation deduction is lower than it would be by the straight line method. As we have pointed out, the effect of this accelerated depreciation upon future taxes cannot be determined at this time by the commission, the utility, or the Congress. Future taxes will be determined not only by the depreciation allowance but by the utility's operating expenses, gross income, and the tax rate, which are not certain or presently predictable. Moreover, the depreciation allowance for tax purposes will also depend upon the amount of new property which this utility constructs or acquires in future years, a matter solely within the realm of conjecture. Hence it cannot be said categorically that present customers will benefit at the expense of future customers. Rather, the result of normalization at best would be to require the present customers to finance plant expansion which may benefit both future customers and the utility; in fact, a capital contribution would then be made by present customers. See *Linds*

*heimer v. Illinois Bell Telephone Company*, 292 U. S. 151, 169, 54 S. Ct. 658, 78 L. Ed. 1182, 1194; *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 178 Pa. Superior Ct. 46, 56, 112 A. 2d 826; *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 550, 556, 109 A. 2d 719. See, also, *Pittsburgh v. Pennsylvania Public Utility Commission*, 370 Pa. 305, 320, 321, 88 A. 2d 59.

The fundamental defect in the utility's position in this matter is that it ignores the fact that a utility is allowed to pass on to its customers only its proper expenses and allowances plus a legitimate profit or return to the utility. A bonus or gratuity based upon hypothetical considerations in addition to this is improper and not permissible. *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 182 Pa. Superior Ct. 376, 392, 126 A. 2d 777.

(2) Consolidated return. For purposes of computing and paying its federal income tax, the utility joins with the Columbia Gas System, Inc., and its other subsidiaries in a consolidated tax return. Based upon the actual tax paid, with an adjustment for a nonrecurring tax deduction of certain deficit companies, the commission computed the annual allowance for federal income taxes to be $4,107,000 as previously indicated. If the utility filed a separate tax return, the actual tax liability would be approximately $4,-488,500. The saving which results from the consolidated return is computed to be $381,500, or 8.5 per cent. Although the utility also disputed the percentage amount of the saving before the commission, it presses only the contention that the annual tax allowance for rate purposes should have been computed on the basis of a separate return rather than on the basis of the actual tax paid under the consolidated return.

In our opinion this contention is similar to that relating to accelerated depreciation in that it would substitute for evidence of actual expenditures an allowance based upon hypothetical considerations with a corresponding increase in rates. See *Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 182 Pa. Superior Ct. 376, 390, 391, 126 A. 2d 777. The rates of a utility are to be computed on the basis of providing a fair return on the fair value of its property used and useful in the public service after allowance for proper operating expenses, taxes, depreciation, and any other legitimate item. In computing the cost of operation and service, the commission considers evidence of the actual expenses, properly adjusted when the evidence warrants; there is no legal or equitable reason for a supplemental return in the guise of allowances for taxes or other expenses which are not incurred.

It is the contention of the utility, however, that it and the parent company should retain the benefits derived from the use of the consolidated return because the parent company contributed expenses in the amount of $2,957,556 to the 1954 consolidation; and that it would be inequitable to allow the utility's customers to benefit thereby. It is argued that the customers of the utility did not, either directly or indirectly, contribute toward the payment of these expenses; that they were borne solely by the stockholders of the parent company, Columbia. The nature of these expenses is not apparent from the record. The utility's exhibit No. 89 describes them merely as "Excess of Interest Paid, Operating Expenses, Etc., Over Other Income." We have examined the evidence offered by the utility in this respect and find no further elaboration. In its brief the expenses are claimed by the utility to "include the salaries of the officers of the parent

company, fees and expenses of trustees under indentures, stock transfer agents and registrars, the maintenance of extensive stockholder records, communications with stockholders, etc." The amount of each of these categories is not mentioned, and there is no comment on the amount of interest paid by Columbia which was included in the expense item in the utility's exhibit. Obviously the administrative expenses mentioned did not make up the entire sum of nearly $3,000,000 dollars, and it is probable that much of this expense was interest paid on the debt of Columbia. The amount of interest has a direct relation to the cost of service to customers of the utility, as the cost of capital to Columbia, which includes interest, is applied to the utility in determining the rate of return. In any event, it is impossible on this record to determine in any reasonable manner whether or not there is any direct or indirect contribution toward these expenses by the customers of the utility.

Our conclusion that the tax was properly computed on the basis of the actual tax liability does not rest solely upon this evidential ambiguity, but upon the more fundamental concept that hypothetical allowances are unwarranted. See *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 207, 90 A. 2d 607. We may not be unmindful that this rate proceeding involves a separate entity, The Manufacturers Light and Heat Company; and that it does not include consideration of the expenses of the parent organization or of its other subsidiaries. We recognized that it was proper to apply the cost of capital to Columbia to this utility because of the peculiar circumstance that the utility had no individual experience in the money market and the cost to Columbia was at prime rates. However, the tax

situation is different because the utility in that field has actual experience, and consequently the only relevant consideration is the actual tax paid by it. The fact that the utility is wholly owned by Columbia cannot cause its customers to contribute toward the operating costs of Columbia in addition to providing the latter with a fair return on its investment in the utility. It appears that the income of Columbia is derived from its investments in its subsidiaries; consequently the customers of the utility in this respect do provide the funds for payment of Columbia's operating expenses. The return which the customers of the utility pay in addition to the proper expenses and allowances of the utility enures to the sole benefit of Columbia and its stockholders. The operating expenses of Columbia are matters of its own concern and are payable out of these profits. Any sum in excess of a fair return on the utility's fair value, which the customers of the utility were required to contribute toward the operating expenses of Columbia, would be without justification. This is true whether the operating expenses of Columbia were directly assessed to customers of the utility or indirectly assessed, as contended here, in the form of an additional allowance for taxes which are not incurred. The use of a consolidated tax return, the same as the use of the holding system of investment, is of mutual benefit to the Columbia Gas System, Inc., and its subsidiaries. Advantages which result from this system should benefit the consuming public as well as the utility and the parent company. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 382, 126 A. 2d 777.

The order of the commission of January 3, 1956, is, to the extent indicated, set aside, and the record is remanded to the commission for the making of an order

(1) requiring The Manufacturers Light and Heat Company to file a tariff with rate schedules designed to produce a return not in excess of 6.30 per cent, (2) modifying the allowance for income taxes to correspond to the allowable return at the rate of. 6.30 per cent, and (3) directing refunds to customers of the excessive amounts collected by The Manufacturers Light and Heat Company under the tariff and schedule filed on January 20, 1956. In other respects the order of the commission is affirmed.

———

DISSENTING OPINION BY GUNTHER AND WRIGHT, JJ.:

For the reasons expressed in our dissents in *Pittsburgh et al., v. Pennsylvania Public Utility Commission et al.,* 178 Pa. Superior Ct. 46, 112 A. 2d 826, and *City of Pittsburgh, Appellant v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 126 A. 2d 777, we are compelled to dissent from the majority opinion on the question of the rate of return. We would affirm the Commission's order in its entirety.