Wall, Appellant, *v.* Pennsylvania Public Utility Commission.

36

Argued April 13, 1956. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and CARR, JJ.

*Walter D. Wall,* appellant, in propria persona.

*John E. Fullerton,* Assistant Counsel, with him *Thomas M. Kerrigan,* Acting Counsel, for Public Utility Commission, appellee.

*Charles E. Thomas,* with him *Hull, Leiby & Metzger,* for telephone company, intervenor.

OPINION BY RHODES, P. J., October 2, 1956:

This is an appeal by Walter D. Wall from an order of the Pennsylvania Public Utility Commission of April 11, 1955, dismissing his complaint to a proposed increase in rates filed by the Blacktown Telephone Company, intervening appellee. Blacktown is a small telephone company located in the village of Blacktown, Mercer County. It serves 408 customers (378 residential and 30 business) by 416 stations from one magneto exchange. This company was incorporated on December 8, 1908, by a group of individuals for their common benefit. The initial invested capital was $5,000. From 1908 until 1949, when the present management acquired control of the company, there was but little change in its management. During this period its affairs had been conducted in an inefficient and unbusinesslike manner, and there was no real effort to improve or extend the system or to maintain it in a condition suitable for normal and reasonable service. Consequently, in 1949 the company was offered for sale, and the present management assumed control in February, 1950. According to the testimony, the records available to the new management consisted of a stock certificate book, a stock transfer book, the annual minutes of stockholders' meetings, subscribers' ledgers, and a number of annual reports. The voucher records, canceled checks, check books, payroll records, and plant

account records were apparently never found. The new management inaugurated a program of rehabilitation. Early in 1951 it became apparent that the rehabilitation program required an increase in rates. On May 29, 1951, Blacktown filed supplement No. 1 to Tariff Telephone-Pa. P. U. C. No. 4, providing for rates designed to increase operating revenues by $3,238, or an increase of 27 per cent. The proposed increase was the first since 1921. Wall, one of the multi-party residence subscribers, filed the only complaint to the proposed new rates on July 12, 1951, alleging that the increase in his service rate was unjust an unreasonable.[1] His rate was increased from $1.33 per month to $2 per month. Although Wall petitioned for suspension of the new rates, the commission allowed them to become effective on August 1, 1951. After hearings the commission ultimately dismissed Wall's complaint, and he then appealed to this Court.

The basic issue throughout the proceeding was whether the proposed rates were just and reasonable; and the burden of showing that the rates met this test was upon Blacktown. Public Utility Law of May 28, 1937, P. L. 1053, §312, 66 PS §1152; *Berner v. Pennsylvania Public Utility Commission*, 382 Pa. 622, 625, 116 A. 2d 738. Ordinarily a utility can adequately prepare to meet its burden by making the necessary expenditures for expert appraisals, and for the preparation of reports, plans, studies, and other data. But Blacktown had an annual income of only $17,000, and it was indicated that to prepare such data would cost about $4,-000. Such cost would exceed the requested increase of $3,238. Obviously such an expense, although it might be passed on to the customers or subscribers in the form

---

[1] Wall made an unsuccessful attempt to acquire control of the company in 1950.

of higher rates, would be unreasonable under the circumstances. Appellant is the only one of the 408 customers to complain. We might dismiss the matter on the ground that his complaints are de minimis, but we shall nevertheless dispose of them on an unsatisfactory record.

Having no records or funds to conduct a full scale study, Blacktown's new management attempted to prove in the usual manner that the proposed rates were just and reasonable. Evidence was presented as to the rate base, the rate of return, annual revenues, annual depreciation, annual expenses, and taxes. To establish the rate base four measures of value were submitted:

(1) "Book cost" depreciated, $20,290; (2) historical cost depreciated, $50,697; (3) reproduction cost new at spot prices of December 31, 1951, depreciated, $66,834; and (4) reproduction cost new at average five-year prices, 1947-1951, depreciated, $61,890. No one of these was entirely acceptable to the commission.[2] Hence, the commission under the circumstances considered the experience of other small telephone companies comparable to Blacktown. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 4, 9, 98 A. 2d 249. The commission ascertained that the average undepreciated book investment for eleven such companies was $117 per customer, while Blacktown's evidence indicated that the undepreciated

---

[2] The commission rejected "book cost" and found that historical cost was not entirely acceptable. There were no books showing an investment account or the actual cost of the company's property. Historical cost may or may not equal original cost; original cost is the amount actually paid to establish a utility. Historical cost is the amount which normally should have been paid for all the property which is usefully devoted to the public service. Historical cost has been particularly useful where original cost has not been available.

"book cost" per customer was $76.46, and that its claimed historical cost per customer was $164.60. The commission considered it reasonable that Blacktown's investment per customer would be between $76.46 and $164.60, and concluded that, if the average of eleven other companies ($117) was applied to Blacktown's 408 customers, a plant investment of approximately $46,700 would result. The commission then considered the inventory of Blacktown and, applying an average installed unit price thereto, found that the result would be a total historical cost of $59,422. No specific finding of accrued depreciation was made, and there was no specific finding of a rate base. Instead, after determining annual operating revenues, annual depreciation, annual operating expenses, and taxes, the commission found that the annual return to Blacktown, exclusive of the deductions, would be $2,141. The commission then capitalized this figure at 6½ per cent as a fair rate of return, and found that this would produce a rate base of $33,000, which would be less than any reasonable finding of fair value of Blacktown's plant at the cut-off date of December 31, 1951. To verify its conclusion that the proposed rates were reasonable, the commission compared them with rates of comparable companies; they were below the average. See *Pennsylvania Power & Light Company v. Public Service Commission*, 128 Pa. Superior Ct. 195, 219, 220, 193 A. 427; *Orlosky v. Pennsylvania Public Utility Commission*, 171 Pa. Superior Ct. 409, 419, 420, 89 A. 2d 903. It was not error for the commission to refrain from making a definite finding of fair value as there was sufficient evidence before it to conclude that the proposed rates were just and reasonable without making such specific finding, and that the fair value would be in excess of any amount necessary to support the rates.

*Pittsburgh v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 87, 92, 95 A. 2d 555; *Pittsburgh v. Pennsylvania Public Utility Commission,* 172 Pa. Superior Ct. 230, 233, 93 A. 2d 715; *Pittsburgh v. Pennsylvania Public Utility Commission,* 168 Pa. Superior Ct. 95, 104, 78 A. 2d 35.

Appellant asserts that there was error in the commission's action in four respects: (1) In failing to find that the plant property had been charged to operating expenses in prior years; (2) in considering data of other telephone companies in determining fair value of Blacktown's plant; (3) in the manner in which the commission determined the rate of return; and (4) in the commission's determination of annual operating revenues, annual depreciation, annual operating expenses for repairs and salaries, and taxes.

1. *Expensed property.* Appellant contends that the plant property of Blacktown was "expensed" in prior years within the meaning of our decision in *Pittsburgh v. Pennsylvania Public Utility Commission,* 158 Pa. Superior Ct. 229, 236, 237, 44 A. 2d 614, and that therefore it should not have been considered in the determination of the fair value of the property used and useful in public service on December 31, 1951, the cut-off date. A sufficient answer to appellant's contention would be to reiterate that no definite finding of fair value was made by the commission; there was merely a testing of the values that would clearly support a conclusion that the rates were just and reasonable. While this procedure is not approved or condoned, we think it was permissible under the circumstances in this case. Furthermore, we find nothing substantial in the record to indicate that the property had been charged to operating expenses in prior years, as appellant contends. In *Pittsburgh v. Pennsylvania Public*

*Utility Commission,* supra, 158 Pa. Superior Ct. 229, 236, 237, 44 A. 2d 614, we held that capital additions to the utility's property which had been charged upon the books of the company as operating expenses could not be subsequently included as a capital item in the rate base. We there said (page 237 of 158 Pa. Superior Ct., page 617 of 44 A. 2d) : ". . . where . . . a part of the earnings, according to the books of the company, were disbursed as operating expense, the company, having recouped the entire cost from the rate payers, over and above adequate profits paid to security holders, and having enjoyed the benefits of treating the cost as operating expense, cannot later be permitted to say that these expenditures are capital investment on which consumers must pay an additional return."[3]

The expensed property doctrine is essentially a rule of logic; it prohibits a double allowance for the same item merely by placing it in two categories. To express it otherwise, a utility should not receive credit for the same deduction by treating it as an ordinary expense on one occasion and by capitalizing it on another. Inherent in the application of the rule is the fact that a double allowance would result. There is no such proof in the present record. It does not appear on this record that the rates which were fixed in 1921 brought in a fair return to Blacktown in addition to paying for its property as an ordinary expense. Since the records prior to 1950 were not available (if kept at all), there is nothing to indicate with certainty the manner in which the property had been treated from an account-

---

[3] We have also held that items of ordinary expense cannot be capitalized and included in the rate base. *Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 199, 90 A. 2d 607; *Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 38, 54, 95 A. 2d 244.

ing standpoint. To establish that the property had been expensed in prior years, appellant relies upon the testimony of W. G. Christley, a former secretary of Blacktown from 1916 to 1949. Christley testified that capital replacements had been classified as any other expense, and were deducted in the year in which they were paid. At another point he testified that the property was capitalized; and he finally admitted that he did not know what was meant by the term "expensed property." The most that can be said of the confused and contradictory testimony of this witness is that it showed payment for property as it was purchased or as improvements were made. It does not follow that the property was therefore "expensed", resulting in a dual allowance for rate purposes. Even though an item is shown to have been purchased and paid for in full in one year, and is so carried on the company's books, it does not necessarily mean that it has been expensed from a rate making standpoint and therefore charged as such to the customers of the utility. The last rate proceeding for Blacktown occurred in 1921, and subsequent capital improvements could not possibly have been expensed for rate purposes. The record in no way indicates that the property which was owned at that time was treated as an ordinary expense. As there was no rate proceeding in the interim, or any complaint to the then established rates, it must be presumed, for present purposes, that the rates paid by Blacktown customers since 1921 produced for the company only a fair return in addition to the usual operating expenses and other legitimate deductions.

Appellant asserts that the previous rates must have been excessive because the prior management paid cash dividends from 1931 to 1949 in an amount approximating 188 2/3 per cent of the par value of the outstanding

stock, and also redeemed $1,300 of stock in that period. The premise does not support the conclusion. The dividends averaged 8.2 per cent annually for those years. Although certain of the dividends (one was a 100 per cent cash dividend) appear high, this may be considered as an indication of previous mismanagement. This money probably should have been part of a depreciation reserve to replace worn out and obsolete equipment. The unbusinesslike conduct of the prior management ultimately resulted in financial embarrassment of this company in 1949. The present users of Blacktown's service, however, should not be required to undergo further deprivation of reasonable service because the inadequacy of prior management was not discovered until the position of the company was almost hopeless. Cf. *Blue Mountain Telephone & Telegraph Company v. Pennsylvania Public Utility Commission,* 165 Pa. Superior Ct. 320, 330, 67 A. 2d 441.

2. *The use of data of other telephone companies in determining fair value.* Appellant contends that the commission erred in considering the book cost per customer of eleven comparable telephone companies in its determination of what would be the fair value range of Blacktown's plant. As previously stated, the commission made no specific finding of fair value, but merely indicated amounts which would support a finding that the proposed rates were just and reasonable. In testing the evidence presented by Blacktown the commission considered the experience of comparable companies and found that the cost per customer of Blacktown compared favorably therewith. In addition, the commission tested this against the average unit cost installed of various plant items of Blacktown and again found a reasonable comparison. We find no error on the part of the commission in considering experience of compa-

rable companies for the purpose of verifying the evidence of Blacktown, in view of the fact that proper records were not available and that the other evidence of value which was presented was not free from error. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 174 Pa. Superior Ct. 4, 9, 98 A. 2d 249.

3. *Rate of return.* There was testimony submitted by Blacktown that a reasonable rate of return would be a rate of 8 per cent. Blacktown's witness in this respect was J. S. Armstrong, executive vice-president and trust officer of the Grove City National Bank. He was familiar with the financial problem of Blacktown, and he testified relative to a $10,000 loan to Blacktown which required the personal endorsement of the directors of the company, and to a later conversion to a mortgage with personal endorsement. He pointed out that the physical assets of Blacktown had deteriorated to the point where they were insufficient to justify an extension of credit. He also had knowledge of the return on preferred and common stock of other small telephone companies, and of investors' demand in that respect. He gave the reasons why his bank would not want to rely upon Blacktown's credit for a loan unless the company had a rate of return of 8 per cent. The commission in considering this evidence referred to its experience with companies of comparable size and found that a return of 6½ per cent "would not be excessive." Although Armstrong was not an expert in the utility field, we think it could be said that he was familiar with the unusual problems of Blacktown, and that his testimony was entitled to some weight. Under normal conditions a number of factors, if shown by the evidence, may be considered in determining a fair rate of return. Among them are: (1) The amount necessary to assure confidence in the financial structure of the company

and to maintain its credit standing (*Bluefield Water Works & Improvement Company v. Public Service Commission*, 262 U. S. 679, 692, 43 S. Ct. 675, 679, 67 L. Ed. 1176); (2) the payment of dividends and interest (*Pennsylvania Power & Light Company v. Public Service Commission*, supra, 128 Pa. Superior Ct. 195, 211, 212, 213, 193 A. 427); (3) amount of the investment, the size and nature of the utility, its risks, and the circumstances attending its origin, development, and operation (*Solar Electric Company v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 387, 388, 9 A. 2d 447). Obviously, Blacktown was in poor condition both financially and physically. Appellant's complaint that the commission fixed the rate of **return** solely by reference to other comparable companies is without merit. Moreover, a 6½ per cent rate of return would be below the cost of capital to this company, as indicated by the evidence. See *Pittsburgh v. Pennsylvania Public Utility Commission*, 178 Pa. Superior Ct. 46, 69-71, 112 A. 2d 826.

4. *Annual operating revenues, annual depreciation, annual operating expenses, and taxes.* The commission found that Blacktown would receive under the new tariff annual operating revenues of $17,044. It also allowed $2,000 for annual depreciation and fixed operating expenses including maintenance and salaries at $12,423. An allowance was made for income taxes in the amount of $480. The balance for return was $2,-141.

Annual operating revenues. In computing the annual operating revenues, the commission noted that the operating revenues for 1951 were $14,765. It then found on the basis of the number of customers and the proposed increase in rates that these revenues would be increased to $17,044. Appellant contends that the com-

mission failed to annualize the future increase in toll revenue for the forty-three new subscribers from whom tolls were received by Blacktown for only a portion of the year 1951; and that the commission erred in not making adjustment for an increase in toll revenues from the Bell Telephone Company which became effective January 7, 1952, after the cutoff date in the present proceeding. Aside from being de minimis the first contention of appellant is entirely devoid of merit. The amount of toll revenue from any subscriber necessarily depends upon the number and the places to which toll calls are made. Any estimate of future toll revenues would be a judgment figure based upon evidence of past experience. Concerning new customers there would be little informative data. Appellant failed to establish any abuse of discretion on the part of the commission in this respect. His second objection concerning the increase in tolls from the Bell Telephone Company after the cutoff date was dismissed by the commission with this comment: "Complainant is in error in adjusting operating revenues for conditions existing after the test year without making adjustments for changes in operating expenses." We have frequently recognized that any adjustments for increase in revenues after the test year should require an adjustment for the commensurate increase in expense during the same period. *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 568, 587, 588, 107 A. 2d 745. Moreover, adjustments concerning matters after the cutoff date are, to a very large extent, within the commission's discretion. *Duquesne Light Company v. Pennsylvania Public Utility Commission*, 174 Pa. Superior Ct. 62, 69, 70, 99 A. 2d 61.

Depreciation. The commission made an allowance for annual depreciation in the amount of $2,000. This

was computed after concluding that the historical cost of depreciable property required to serve Blacktown's 408 customers would be no less than $45,000. The commission apparently reached this latter amount by testing the evidence of Blacktown against the experience cost per customer of the eleven comparable companies to which reference has been made. Applying a rate of 4½ per cent the commission determined an annual accrual for depreciation of $2,025. The 4½ per cent rate used by the commission is fully supported by the evidence of record. "Depreciation cannot be determined with mathematical precision; the result, of necessity, must be a judgment figure." *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 550, 559, 109 A. 2d 719, 724. Appellant's contention that the finding is not supported by the evidence is likewise without merit.

Annual operating expenses. Appellant also contends that the commission erred in its allowance for repairs and for salaries of the executive and office personnel. For repairs to wire plant and equipment the commission allowed an annual sum of $5,060.08. This was based largely upon the actual claimed expense of Blacktown for such repairs for the year 1951. Appellant asserts that the allowance should be reduced to $690 or $813, because, according to his calculations, the balance was a capital expenditure and not an operating expense. The evidence indicates that in the year 1951 Blacktown made additions to plant, equipment, and lines, and repairs thereto in the total sum of $9,950.65. Of this amount, $4,890.57 was considered a capital expenditure and the remaining $5,060.08 as an operating (repair) expense. The evidence submitted by Blacktown and by appellant on the nature of the repairs and capital additions was conflicting. In dis-

posing of appellant's contention the commission stated: "There is never a clear line of distinction between what should be construed to be repairs and what should be regarded as capital (plant) replacements, especially where, as here, a small company is involved, for which retirement units have not been prescribed. In the absence of the latter, the distinction is left to the discretion of the public utility." Part of the rehabilitation of Blacktown's plant was substantial and was accounted for as such in the capital account.[4] The remaining expenditures were charged as ordinary repairs. The expenditures for each were approximately equal according to Blacktown's evidence, while appellant claims that more than 90 per cent of the total was a capital expenditure. A large portion of the difference between the claims of Blacktown and appellant apparently involves those items which were neither clearly capital items nor clearly expense items. Blacktown's evidence (exhibit No. 10) indicates that the $5,060.08 spent for repairs consisted of $3,791.92 for labor and $1,268.16 for materials, while the $4,890.57 spent for capital improvements consisted of $2,971.59 for materials, and $1,918.98 for labor. It is apparent that the greater portion of the amount claimed for repairs involved the cost of labor which normally would be the major expenditure in work of a repair nature. On the other hand, the capital expenditure for the year in question consist-

---

[4] The Pennsylvania Public Utility's Commission's Uniform Classification of Accounts for Telephone Companies, Class C, provides:

"When it is necessary substantially to reconstruct or to replace a major portion of any unit of property or any important section of a continuous structure, the cost shall be handled through the plant and equipment accounts; that is, the cost of the property removed or replaced shall be credited to the appropriate plant and equipment accounts and the new property shall be charged thereto."

ed largely of the cost of materials which normally would be the major expenditure for capital items. These figures tend to substantiate the claim of Blacktown. The weighing of the evidence and the resolution of conflicts therein were matters for the commission. *Duquesne Light Company v. Pennsylvania Public Utility Commission,* supra, 176 Pa. Superior Ct. 568, 582, 107 A. 2d 745. We find no abuse of discretion on the part of the commission under the present circumstances, and we do not believe that a double allowance would result at this time. Future rate proceedings, however, should recognize the extent to which certain items were included as expense items in this proceeding.

It is also apparent that, in allowing the claimed amount as a repair expense, the commission gave consideration to the fact that the physical plant of Blacktown was in poor condition in 1949, and that thereafter the present management undertook its rehabilitation program which entailed not only plant replacements but general repair work as well. The first few years of rehabilitation would naturally require a greater amount for repairs than would be ordinarily needed for maintenance. Moreover, the financial condition of Blacktown would probably influence its expenses for repairs. Where a larger company would replace an item of plant with new equipment, it may have been necessary for Blacktown to repair the old equipment. The evidence discloses that this is what Blacktown has done on occasion. It was not improper for the commission to consider this situation in determining the allowance for repairs.

An examination of appellant's contention indicates how unrealistic it is. He would reduce the annual allowance for repairs to $600 or $800, a decrease of approximately $4,500 from that which was allowed. Con-

sidering that in this rate proceeding Blacktown sought an increase in annual revenue of only $3,238, it follows that a reduction would be required in the rates which were in existence since 1921. Such a result is certainly not warranted by the record.

The commission allowed annual salaries as follows: The secretary and general manager, $1,200, the billing clerk, $600, and the treasurer, $150. The evidence fully justified the allowance. The testimony indicated that Stephen Lukacs, who occupied the positions of secretary and general manager, spends four to five hours a day on the affairs of Blacktown. The billing clerk is the daughter of Lukacs, and she spends seventy-five to one hundred hours a month preparing bills and accepting payments. The treasurer issues the checks and prepares a cash disbursement record. Appellant makes the novel contention that, since Lukacs and his family own a controlling interest in Blacktown, they are an affiliated interest and should meet the strict test of *Berner v. Pennsylvania Public Utility Commission*, supra, 382 Pa. 622, 626, 116 A. 2d 738. Although we do not pass upon the applicability of that decision to the present circumstances, we have no hesitancy in concluding that the test in any event has been adequately met.

Taxes. The commission allowed Blacktown the sum of $480 annually for state and federal income taxes. Appellant's complaint in this respect appears to be that the actual basis for payment of the federal tax was not established, and that the commission in computing the federal tax used a property base of $61,000 for its depreciation allowance of $2,745. Appellant believes that the federal government would not accept such a high property base and depreciation deduction because the property had been expensed in prior years. The depreciation allowance used by the commission for tax pur-

poses was higher than that allowed by it for rate purposes. As Blacktown points out, if appellant's contentions prevail, the federal income tax allowance would be higher since the depreciation deduction would be lower. Under the circumstances we cannot see any merit or reason for appellant's complaint in this respect.

Blacktown's record for public service has not been commendable. Its poor management over a period of years brought it to a state of disrepair and virtual financial ruin. The present management has endeavored to rehabilitate the company, and in doing so found that a slight increase in rates was required. We have consistently said that a public utility in this commonwealth is entitled to receive a fair return on the fair value of its property used and useful in the public service. *Citizens Water Company v. Pennsylvania Public Utility Commission*, 181 Pa. Superior Ct. 301, 306, 124 A. 2d 123. Unfortunately, in the present proceeding a rate base could not be determined with mathematical certainty. That Blacktown's fair value would be above any amount necessary to sustain the rates as just and reasonable was adequately established. It should also be noted that much of the plant of the company in 1949 was probably obsolete. As a result, in 1950 and 1951, the new management expended over $18,000 for new plant equipment, exclusive of the expenditures for repairs. Although there were no books or records of the original cost of the plant and its subsequent additions and improvements, the utility would not be prevented, for this reason alone, from including the fair value of such property in the rate base. *Orlosky v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 409, 417, 89 A. 2d 903.

54

We do not approve of every phase of the procedure which has been followed in this case or recognize it as a future precedent. The result, however, was a proper solution of the problem affecting the survival of this company and its duty to provide reasonable service to its customers. The record supports the rate increase and the commission's finding that the rates complained of are not excessive. We may add that appellant's ill-tempered and derogatory remarks in his brief about the commission are inexcusable. We find no substantial error requiring the reversal of the commission's order.

The order of the commission is affirmed, at the cost of appellant.