Pittsburgh, Appellant, *v.* Pennsylvania Public Utility Commission (et al., Appellant).

342

Argued June 10, 1958. Before RHODES, P. J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Marcus Aaron, II,* Assistant City Solicitor, with him *J. Frank McKenna, Jr.,* City Solicitor, for City of Pittsburgh.

*Paul H. Rhoads,* with him *William Anderson, Jr., John P. Egan, Jr.,* and *Rhoads, Sinon & Reader,* for Utility Company.

*Morris Mindlin,* Assistant Counsel, with him *Thomas M. Kerrigan,* General Counsel, for Pennsylvania Public Utility Commission, appellee.

*Robert L. Orr,* with him *Harold F. Reed,* and *Reed, Ewing, Orr & Reed,* for certain industrial consumers, intervening appellees.

OPINION BY RHODES, P. J., September 11, 1958:

The Pennsylvania Public Utility Commission, by its order of February 10, 1958, granted an increase in rates to The Manufacturers Light and Heat Company.[1] The City of Pittsburgh and The Manufacturers Light and Heat Company have appealed. Each sets forth certain alleged errors in the findings and order of the commission. Several industrial customers have intervened as appellees.

---

[1] This is the third increase in rates granted to this company within a period of five years. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 551, 554, 555, 128 A. 2d 372; *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 112 A. 2d 826.

This rate proceeding was instituted by Manufacturers on March 12, 1957, by the filing with the commission of supplements 2 and 3 to Tariff Gas—Pa. P. U. C. No. 44 providing for increases and changes in the then existing rates to become effective May 12 and 13, 1957. On March 25, 1957, the commission suspended operation of these supplements for six months, that is, to November 12 and 13, 1957, and by concurrent order instituted on its own motion an investigation to determine the fairness, reasonableness, justness, and lawfulness of the rates, charges, rules, and regulations in the proposed supplements, the investigation to include consideration of the lawfulness of existing rates, rules, and regulations and the imposition of temporary rates. Subsequently, in the course of this proceeding, additional supplements were filed by Manufacturers affecting the rates involved in this proceeding, which supplements the commission considered in its final order.[2]

---

[2] As a result of our opinion filed December 28, 1956, in the prior rate proceeding (*Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 551, 583, 128 A. 2d 372), the commission by an order of April 29, 1957, required Manufacturers to reduce its rates; in compliance therewith Manufacturers filed supplement 6 to tariff No. 44 to become effective May 20, 1957.

On June 10, 1957, Manufacturers petitioned the commission to permit the increased rates proposed in supplement 2 to become effective July 14, 1957, to the extent of 1.9 cents per MCF increase in each consumption block of the then effective rates, due to the alleged increased cost of gas purchased from five southwest area suppliers; this petition was denied by the commission.

On July 26, 1957, Manufacturers again filed a petition seeking to have the suspension of supplement 2 lifted since the increases in the cost of gas from its southwest suppliers had become effective on July 14, 1957. By order of September 3, 1957, the commission modified its order of March 25, 1957, relating to supplement 2 and permitted increases in Manufacturers' rates of 1.9 cents per MCF over the then effective rates. On September 6, 1957,

Thirty-two complaints were filed against the proposed rates. After extensive hearings, the filing of briefs, and oral argument, the commission on February 10, 1958, issued its final order permitting an increase in annual operating revenues amounting to $3,071,902 over the rates which had become effective on September 3, 1957, by the filing of interim supplement 8. The commission disallowed $2,964,888 of the increase requested by Manufacturers.[3]

Manufacturers filed supplement 8 to tariff No. 44 making effective as of September 3, 1957, the said increases in the rates set forth in supplement 6. The commission pointed out in its order of September 3, 1957, that, in the event that the final adjudication in this proceeding showed that the rates collected under supplement 2 were excessive, the commission would consider the matter of refunds to customers for the excess revenues collected.

By order dated October 28, 1957, supplement 3 was suspended for a further period of three months to February 13, 1958.

On July 19, 1957, Manufacturers filed supplement 7 to tariff No. 44, proposed to become effective September 19, 1957, calling for an increase in rates to offset the increase in the cost of gas purchased from Texas Eastern Transmission Corporation, contemplated to become effective November 10, 1957. Supplement 7 as filed was additive to supplement 3. By order of September 9, 1957, the commission suspended the rates prescribed by Manufacturers in supplement 7 for a period of six months from September 19, 1957, to March 19, 1958. Supplement 7 was made a part of the present proceedings. On November 2, 1957, Manufacturers sought to have the suspension lifted on a portion of supplement 3 to recover the increased cost of gas purchased from Texas Eastern Transmission Corporation to become effective on November 10, 1957. This petition was denied by the commission on December 9, 1957.

All of the matters were considered by the commission in its order of February 10, 1958, from which the present appeals have been taken.

[3] The interim rates, effective September 3, 1957, by the filing of supplement 8, increased gross revenues by $1,490,052 at the level

Appellants have presented five questions for our determination.

The City of Pittsburgh submits the following three questions: (1) Did the commission violate the requirements of due process in computing accrued depreciation and depletion upon the basis of a reserve requirement study rather than the book depreciation reserve; (2) did the commission err in failing to reflect the effect of the liberalized depreciation provisions of section 167 of the 1954 Internal Revenue Code in computing the allowable federal income taxes for rate-making purposes; and (3) is the rate structure free from unreasonable and unlawful discrimination.

Manufacturers raises two questions: (1) Did the commission err in its finding of the fair value of Manufacturers' property; and (2) did the commission err in adjusting the test year revenues to reflect the effect of a steel strike occurring in the test year in view of an alleged decline in sales to the steel industry occurring after the test year.

We shall in this opinion consider the issues presented by both appellants in such sequence that repetitious discussions may be largely avoided.

*Fair Value.* The commission determined that the fair value of Manufacturers' property used and useful in the public service allocated to Pennsylvania retail sales was $115,000,000 at May 31, 1957, the cut-off date. Manufacturers contends that the finding of fair value would be at least $125,000,000 if the commission had given "proper consideration [to] prevailing price levels." In support of its proposed rates, Manufacturers submitted as measures of value its original cost and original cost trended at the average price level of

of operations of May 31, 1957. The total annual operating revenues allowed by the commission in its final order was $56,180,026.

the test year and at two and three-year average price levels.[4]

At the request of the commission, Manufacturers also prepared a trended original cost study at the five-year average price level. The commission considered and adjusted the evidence submitted. After deduction for accrued depreciation and depletion and the addition of materials and supplies the commission arrived at the following measures of value: Original cost $92,418, 426; original cost trended to average price level of 1956, $149,259,036, to average price levels of 1955-1956, $140,863,447, to average price level of 1954-1956, $137,318,630, and to average price level of 1952-1956, $131,331,830. From these the commission determined the fair value of Manufacturers' property used and useful in the public service allocated to Pennsylvania retail sales to be $115,000,000 at May 31, 1957. Manufacturers contends that in arriving at fair value of $115,000,000, the commission took an average of the depreciated original cost and the depreciated trended original cost at the three-year average price level to arrive at a figure of $114,868,528 which it rounded to $115,000,000.

It is argued that a finding of a present fair value should be based substantially on depreciated trended original cost at the two or three-year average price level, and that if original cost is entitled to any consideration it should not be given equal weight with the measure of value based on three-year average prices. The fair value of the property upon which a utility

---

[4] The net measures of value, being the gross measures of value less accrued depreciation and depletion plus materials and supplies as submitted by Manufacturers, were as follows: Original cost $93,284,059; original cost trended to the average price level of 1956, $150,469,988, to average price level of 1955-1956, $142,005,005, to average price level of 1954-1956, $138,426,978.

in this Commonwealth is entitled to receive a fair return is the value existing at the time the rates are established or at the time the value is in issue. *Citizens Water Company v. Pennsylvania Public Utility Commission,* 181 Pa. Superior Ct. 301, 306, 124 A. 2d 123. Fair value for rate-making purposes, however, is not the literal present fair value for any particular purpose, but it is the fair value of the property as that term is understood for rate-making purposes; in this respect fair value has a connotation peculiar to rate proceedings. There is no particular formula by which the commission is bound in fixing the rate base; all facts which have a relevant bearing on fair value, as that term is used in rate proceedings, should be considered. *Equitable Gas Company v. Pennsylvania Public Utility Commission,* 160 Pa. Superior Ct. 458, 463-466, 51 A. 2d 497; *Citizens Water Company v. Pennsylvania Public Utility Commission,* supra, 181 Pa. Superior Ct. 301, 307, 124 A. 2d 123; *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 195, 90 A. 2d 607. See, also, *Johnstown v. Pennsylvania Public Utility Commission,* 184 Pa. Superior Ct. 56, 66, 133 A. 2d 246. "Under the fair value rule prevailing in this state, consideration should be given to original cost and *average price* reproduction cost of the property; . . ."[5] *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 198, 199, 90 A. 2d 607, 613. As we said in *Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission,* 186 Pa. Su-

---

[5] An acceptable substitute for average price reproduction cost is trended original cost which produces an estimated reproduction cost. *City of Pittsburgh v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 187, 198, 90 A. 2d 607; *Johnstown v. Pennsylvania Public Utility Commission,* 184 Pa. Superior Ct. 56, 69, 133 A. 2d 246.

perior Ct. 1, 11, 140 A. 2d 114, 119: ". . . fair value is not necessarily synonymous with original cost or with any other single measure of value."

The contention that reproduction cost must be given predominant weight by the commission has been raised and rejected in prior cases. *Equitable Gas Company v. Pennsylvania Public Utility Commission*, supra, 160 Pa. Superior Ct. 458, 465, 51 A. 2d 497; *City of Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 187, 196, 90 A. 2d 607. The reason is obvious as no one measure of value is controlling. For this reason original cost is ordinarily not considered the equivalent of fair value and need not necessarily be given predominant weight by the commission in fixing a rate base. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 187, 195, 90 A. 2d 607. See, also, *Citizens Water Company v. Pennsylvania Public Utility Commission*, supra, 181 Pa. Superior Ct. 301, 312, 124 A. 2d 123.

The apparent purpose of the requirement that the commission exercise its judgment upon all the relevant facts and not confine itself to any one particular measure of value is to arrive at a rate base which is fair to both the utility and to the customer. *City of Pittsburgh v. Pennsylvania Public Utility Commission*, supra, 171 Pa. Superior Ct. 187, 197, 90 A. 2d 607. The commission is not obliged to give equal weight to each measure of value; its duty is to consider all of the measures and exercise its judgment thereon. The commission may give more weight to one than another, but it is not required to do so. To be fair to both the utility and the customer generally requires that the commission reject as the predominant measure of value any particular measure which would be unreasonably advantageous to one at the expense of the other of the

component interests which the commission is required to keep in balance in the public interest.

The argument of Manufacturers that in our present economy the costs and prices of material and labor are constantly rising and will continue to rise in the future ignores the standards by which fair value is determined in a rate proceeding, as those standards have been established under the statute and by numerous cases. The argument ignores the "manifest defects" of reproduction costs (*Equitable Gas Company v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 465, 51 A. 2d 497); it ignores the fact that reproduction cost is usually much greater than the actual original investment in the utility; and it ignores also the very practical consideration that, while from year to year the reproduction cost of the property of any particular utility may be higher because the fair average price of labor and materials may rise, the utility is not required to, and does not normally, replace more than a fraction of its property in any particular year or over several years. Moreover, it is not obliged to finance an expense equal to the total reproduction cost of its property in any short period of time. It is also true that, while the property invested in a utility may gain in value because of a rise in the reproduction cost thereof, the gain in value is not necessarily equal to the increased cost to replace such property. See *Equitable Gas Company v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 465, 51 A. 2d 497. It is improbable that any plant would be reproduced in its entirety; obviously reproduction cost is merely theoretical. See *Philadelphia v. Pennsylvania Public Utility Commission,* 173 Pa. Superior Ct. 38, 52, 95 A. 2d 244.

We have said that: ". . . it was never intended that fair value be the equivalent of market price or cost at

current prices." *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 199, 90 A. 2d 607. A rate base equivalent to a current reproduction cost would be an anomaly. Of course, a valuation so great as to render rates based thereon unjust from the standpoint of the public should be rejected. *Citizens Water Company v. Pennsylvania Public Utility Commission,* supra, 181 Pa. Superior Ct. 301, 310, 124 A. 2d 123; *City of Scranton v. Public Service Commission,* 80 Pa. Superior Ct. 549, 560.

The following is an applicable statement: "The weight to be given to the established measures of value was a matter for the commission if its discretionary power was not capriciously exercised. Ordinarily, a finding of fair value should not be merely a mathematical average, but should display an exercise of well-founded judgment. In the absence of an error of law, an abuse of discretion, or any indication of caprice, we shall not disturb the finding of fair value." *Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission,* supra, 186 Pa. Superior Ct. 1, 12, 140 A. 2d 114, 120. See, also, *West v. Chesapeake & Potomac Telephone Company of Baltimore City,* 295 U. S. 662, 55 S. Ct. 894, 79 L. Ed. 1640, 1647, 1648.

*Accrued Depreciation.* In this proceeding, as in the two prior proceedings, the commission rejected the evidence of book reserve for accrued depreciation and depletion submitted by the utility as unreliable and ordered Manufacturers to prepare a reserve requirement study. The reserve requirement study indicated that actual accrued depreciation and depletion was less than the amount in Manufacturers' book reserve. The reserve requirement study was revised by the commission and as revised was used to determine accrued depreciation in arriving at the rate base in this pro-

ceeding. The city contends that a deduction for accrued depreciation and depletion of any amount less than the book reserve results in a confiscation of the property of the customers in violation of due process of law. To have validity this contention must be based upon a factual finding that the excess of the book reserve over the reserve requirement was a genuine one in the sense that it had been contributed by the ratepayers over the years in addition to providing the utility with a fair return.

It would seem that customers have no right of property in the plant of a utility which serves them. "Their only right, growing out of the dedication of the property to public use, . . . [is to use the service furnished] at such rate and subject to such regulations as the legislature, exercising the police power, may establish." *City of Scranton v. Public Service Commission,* 80 Pa. Superior Ct. 549, 558. See, also, *Board of Public Utility Commissioners v. New York Telephone Company,* 271 U. S. 23, 32, 46 S. Ct. 363, 70 L. Ed. 808, 812. On the other hand, the ratepayers are not required to make capital contributions to the utility. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 551, 579, 580, 128 A. 2d 372. A closely related principle prohibits the utility from capitalizing in the rate base an item which has been recovered as an expense from the ratepayers. See *Wall v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 35, 42, 125 A. 2d 630.

In arriving at a fair value based upon the respective measures of value in a rate proceeding, the commission is required to ascertain the actual depreciation of the utility's property as it has accrued to the date that fair value is in issue. The nature of depreciation is such that it cannot be determined with mathematical precision; it must of necessity be a judgment

figure based upon the reliable evidence submitted. *Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 409, 416, 89 A. 2d 903; *Harrisburg Steel Corporation v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 550, 559, 109 A. 2d 719. The reserve for depreciation and depletion appearing on the books of Manufacturers was found by the commission to be unreliable and insufficient to afford a proper basis for the calculation of accrued depreciation and depletion in the rate proceeding which was before us in *Pittsburgh v. Pennsylvania Public Utility Commission,* 178 Pa. Superior Ct. 46, 55, 112 A. 2d 826.[6] In that case we discussed in detail the evidence of record which pointed to the inconsistent methods which had been used in accumulating the reserve for depreciation and depletion from its inception by the utility in 1910. We there said (page 55 of 178 Pa. Superior Ct., page 830 of 112 A. 2d ) : "With reference to the record, the commission pointed out its reasons for rejecting the book reserve in determining accrued depreciation and depletion as of July 31, 1953. The reserve for depreciation and depletion was first established by the utility in 1910. In the intervening forty-three years there were twenty-three revisions made in the annual accrual rates. Since 1948 depreciation has been accrued on a service-life basis by plant accounts, and depletion has been determined on a unit of pro-

---

[6] The book reserve for depreciation may be unreliable for any number of reasons. For example, in *Johnstown v. Pennsylvania Public Utility Commission,* 184 Pa. Superior Ct. 56, 73, 133 A. 2d 246, it was computed on the shortest possible life allowable by the Internal Revenue Service for income tax purposes. See, also, *Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 409, 415, 416, 89 A. 2d 903, where the book reserve was "entirely inconsistent" with the depreciation on other fixed capital, and we stated: "It appears that the depreciation reserve set up on a utility's books is not binding on the Commission in any way."

duction basis. The commission further pointed out that the estimates of service-lives were not based on actuarial studies of the utility's retirement experience but rather on the judgment of the management and of the operating personnel, and that, no matter how accurate the estimates may have been from time to time in previous years, only by coincidence would the book reserve for depreciation and depletion be a reliable measure of accrued depreciation and depletion at a later date.

"It further appears from the record that the utility and its predecessor companies made depreciation accruals regardless of earnings. There is no countervailing evidence in the record that past rate payers were overcharged or that management abused its discretion in determining annual charges for depreciation and depletion. Certainly, the commission was not obliged to find that the excess of book reserve over the reserve requirement was genuine."

The subsequent rate proceeding of Manufacturers, which was before us in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 557, 560, 128 A. 2d 372, also involved the reliability of this same book reserve for depreciation and depletion. We again sustained the factual finding and conclusion of the commission that the book reserve did not afford a reliable basis for computing these elements in determining fair value. The present record likewise supports the conclusion of the commission that the book reserve was not reliable for the same reasons apparent in the prior proceedings.

In both prior proceedings, as in the present proceeding, the commission, after rejecting the book reserve evidence, required Manufacturers to submit a reserve requirement study in furtherance of its burden to substantiate the requested rate increase. This pro-

cedure was approved by this Court in *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 559, 128 A. 2d 372.

In this respect the controlling issue is the actual depreciation and depletion at the time fair value is to be found, as that may be determined by the exercise of a well founded judgment having basis in the evidence. Since the book reserve for depreciation and depletion was unreliable, having been accrued regardless of earnings, the disregard of the excess of the book reserve over the computation of the reserve requirement study was not a confiscation of any property of the ratepayers or a deprivation of their property without due process of law. The excess in fact was not genuine. The processes of the law followed by the commission in this proceeding were those designed to closely approximate the actual accrued depreciation and depletion at the time; the methods used were those approved by this Court. Disregarding the excess of the book reserve over the reserve requirement study does not establish on this record any capital contributions by customers for property now included in the rate base. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 560, 128 A. 2d 372. Nor does it establish any dual allowance for recovery of the same item within the meaning of the so-called expensed property doctrine.

In no event will a utility be permitted to recover by annual allowances for depreciation a total amount in excess of the original cost, since annual depreciation is computed on original cost and not upon fair value or reproduction cost. *Equitable Gas Company v. Pennsylvania Public Utility Commission,* supra, 160 Pa. Superior Ct. 458, 471-473, 51 A. 2d 497; *City of Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 171 Pa. Superior Ct. 187, 213, 90 A. 2d 607.

*Income Tax Allowance—Accelerated Depreciation.*
Manufacturers pays its federal income tax on the basis
of a return consolidated with its affiliates in the Co-
lumbia Gas System, Inc. The commission allowed the
utility $4,909,870 for federal income taxes computed
on the basis of this consolidated return under rates
permitted by the commission's order. In computing
the amount of the tax, the commission accepted Manu-
facturers use of straight line depreciation. The City
of Pittsburgh contends, however, that the allowance
for federal income tax should have been reduced be-
cause, under section 167 of the Internal Revenue Code
of 1954, 26 U.S.C.A. §167, Manufacturers could com-
pute its deduction for depreciation for federal income
tax purposes on the basis of accelerated depreciation
and thereby reduce the amount of tax payable. The
tax saving by use of accelerated depreciation would
amount to approximately $230,000 annually.

Under section 167 (a) of the Internal Revenue
Code of 1954, Congress liberalized the depreciation
methods available to taxpayers in computing their fed-
eral income taxes. In 1954, Manufacturers elected to
take the declining balance depreciation, an accelerated
method, with the result that its tax liability in that
year was reduced by $17,528. *Pittsburgh v. Pennsyl-
vania Public Utility Commission,* supra, 182 Pa. Su-
perior Ct. 551, 569, 128 A. 2d 372. In such last rate
proceeding Manufacturers contended that the commis-
sion erred in failing to permit the utility to retain the
tax saving or deferral resulting from the use of ac-
celerated depreciation by refusing to permit the utility
to normalize the effect of accelerated depreciation.
Manufacturers would have computed the tax allowance
for rate purposes as though the method of deprecia-
tion had been straight line instead of the accelerated
method. We considered this contention in detail and

concluded that the tax saving or deferral should not be retained by the utility, since a utility is permitted to recover from its customers only the federal income tax which is actually paid. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 577, 580, 128 A. 2d 372. As of January 1, 1956, Manufacturers reverted to the use of the straight line method of depreciation for income tax purposes in accordance with an option permitting such reversion in section 167 (e) of the Internal Revenue Code of 1954. The allowance for income taxes, actually paid by Manufacturers to the Federal Government, based upon the use of the straight line method was not in error. It is argued on behalf of the City of Pittsburgh ". . . that Manufacturers' tax liability is the lowest tax payable which would result from prudent and judicious exercise of managerial discretion, consistent with the public interest." Actually the city contends that Manufacturers is obliged to take advantage of accelerated depreciation to reduce the cost of service to its customers. As the commission stated: "City of Pittsburgh contends that respondent should reduce its income tax claim below the level of actual payment by the amount by which such taxes would be reduced if the option with respect to accelerated depreciation were being exercised." The city points out that it is significant that Manufacturers reverted to the use of the straight line method solely because it was denied the benefit of accelerated depreciation in the previous rate case after having used it. The commission gave consideration to the contention of the city and concluded: "Nothing is seen in the background of respondent's decision to revert to straight-line tax depreciation that would justify characterization as an abuse of managerial discretion. There is no evidence of abandonment of the fundamen-

tal plan to claim all depreciation in the course of the life of the property as a deduction from taxable income. There have simply been two revisions of the scheduling, both permitted by law."

It is established in this Commonwealth that one of the costs of the service rendered by a utility is the actual income tax paid to the Federal Government. *Riverton Consolidated Water Company v. Pennsylvania Public Utility Commission,* supra, 186 Pa. Superior Ct. 1, 20, 140 A. 2d 114. The decision to use any permissible method of determining depreciation in filing the federal income tax return and computing the tax is largely a matter for the management of the utility. Management may properly exercise its judgment after consideration of the respective advantages or disadvantages and risks inherent in the use of any of the methods. In the prior proceeding this Court specifically stated (*Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 551, 577, 128 A. 2d 372, 384) : "The utility is not prohibited from using any of the methods set forth in section 167 of the 1954 Code; that is a matter between the taxpayer and the Federal Government. Actually the discretion to use or not to use accelerated depreciation under the 1954 Code is solely with the utility as a taxpayer. The Pennsylvania Public Utility Commission, however, does exercise control over the amount which it will allow the utility for taxes for rate purposes the same as it does over any other annual allowance for expenses. Here the commission has properly allowed the federal income taxes based upon the actual taxes paid." The outspoken attitude of Manufacturers that it reverted to the straight line method because it could not retain the benefits of accelerated depreciation is unbecoming to a public service company. We do not believe, however, that it would be proper to *require,* as a matter

of law, this utility or any other utility to use a particular method of depreciation in computing the federal income tax allowance when the law permits the use of any of several methods which ultimately allows only the deduction of depreciation over the life of the property. The conclusion of the commission that there has been no abuse of managerial discretion in this instance will not be disturbed.

*Adjustment of Test Year Revenues.* In considering the annual revenues to be received by Manufacturers, the commission noted that in the test year 1956 revenues were reduced because of a steel strike occurring in the month of July. The evidence indicated that this loss amounted to $448,615. As adjusted under supplements 2, 3, and 7, the estimated increase in sales would be $469,032, $501,646, and $519,887, respectively. Accordingly, the commission made an adjustment to reflect this non-recurring loss of revenue. Manufacturers contends that no adjustment should have been made for the revenue loss attributable to the steel strike for the reasons that there is no assurance that strikes will not occur in the future, and that after the test year steel production declined thereby reducing the purchase of gas by the steel industry. As we understand the argument in the brief of Manufacturers, the contention is not that the commission failed to make an adjustment for a decline in industrial sales occurring after the test year, but that an adjustment should not have been made for the steel strike occurring in the test year because there was a decline after the test year. The steel strike and the subsequent decline of steel production occurring after the test year are not actually related; they can affect this rate proceeding only by coincidence in that the decline in the purchase of gas after the test year, if properly established, may approximate the amount of

the adjustment made to test year revenues by reason of the steel strike. It cannot be doubted that the adjustment of test year revenues by reason of the steel strike was proper.[7]

Steel strikes are not occurrences of such regularity or of such predictable duration as to make their occurrence and duration in the future other than mere speculation. The object of test year figures is to reflect typical conditions. *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 178 Pa. Superior Ct. 46, 66, 112 A. 2d 826. Where an unusual situation exists which shows that the test year figures are atypical, the commission should adjust the test year data. This is especially true where some unusual and non-recurring item is the cause of the distortion. "The commission has a wide area of discretion with respect to the extent and type of adjustments which it will make to test year data providing there is substantial evidence in the record warranting its action. . . . If the commission acts properly within the sphere of its authority as a fact-finding body, its action will not be disturbed." *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 560, 128 A. 2d 372, 376.

In *Duquesne Light Company v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 62, 69, 99 A. 2d 61, 64, we said: "We have recognized in this rate case the necessity and propriety of a cut-off date and of the use of a base year that the Commission may make an order that is final and appealable. Otherwise the process of rate making would have no finality. At the same time the Commission, in determining rates

---

[7] An adjustment to eliminate the effect of a steel strike has been upheld by this Court in *Duquesne Light Company v. Pennsylvania Public Utility Commission,* 176 Pa. Superior Ct. 568, 586, 107 A. 2d 745.

which are prospective, should consider the latest available relevant data." But the evidence concerning a decline in industrial activity and the commensurate effect upon the revenues of this utility was uncertain and speculative. A witness for the utility stated that sales subsequent to the test year were not known measures.[8] At the argument before the commission in January, 1958, Manufacturers apparently indicated to the commission that industrial sales had declined 62,002 MCF in October, 1957, and 87,230 MCF in November, 1957. The utility projected these figures to arrive at a loss of approximately 900,000[9] MCF per year as compared to the adjustment of 1,074,600 MCF increase made by the commission for the loss attributable to the steel strike. In its brief before this Court, Manufacturers refers to business and financial journals and statistics to show that since the test year the production of steel continually declined. On the other hand, the intervening appellees refer in their brief to the unusually cold weather in the same period, and to reports that Manufacturers had established a new high record for gas sales. Assuming that there is some indication that steel production has declined since the test year, the data is not sufficiently specific to indicate with reasonable certainty the approximate amount by which this would reduce the revenues of Manufacturers. Moreover, we find no data indicative of the effect which this might have upon the expenses of Manufacturers or of any such increase or decrease oc-

---

[8] Mr. C. A. Massa, Vice-President of Manufacturers, testified: "I don't think the sales subsequent to May 31, 1957 to industry are known measures. I am willing to accept, for the purpose of fixing rates, the actual sales that we had during the test year."

[9] This figure is a mathematical projection; there is no evidence before us indicating the actual or approximate subsequent loss of sales to industrial customers.

curring after the test year. There is nothing to indicate whether the revenues of this utility in general increased or decreased as a result of sales to other customers, or that the decline in steel production was a permanent one. The commission found that in the thirty-one month period preceding the end of the test year the only month showing a sizable decline in industrial sales was the month of the steel strike. Any adjustment for changes in revenues occurring after the test year should require a commensurate change in expenses in the same period. *Wall v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 35, 48, 125 A. 2d 630.

While it appears that industrial sales after the test year are an unknown quantity, nevertheless Manufacturers desires that the commission arbitrarily accept the reduction in revenues in the test year caused by the steel strike as a concession for the lack of specification in the matter of the reduction in sales to industrial customers occurring after the test year. The uncertainty of the evidence concerning the effect which the reduction in steel production, as well as other factors, occurring after the test year had upon the revenues of this utility illustrates that the commission should be cautious in making adjustments on the basis of conditions after the test year. A rate proceeding must have some finality, and for this purpose a test year is used and accepted as it may be adjusted by the commission for unusual changes. When there is an occurrence after the test year which affects with certainty, after consideration of all factors, the test year data then the commission may properly give effect thereto. Adjustments concerning matters occurring after the test year are, to a very large extent, within the discretion of the commission. *Wall v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Supe-

rior Ct. 35, 48, 125 A. 2d 630. Adjustments need not be made for temporary economic fluctuations.[10] "While the commission may not be oblivious to evidence relating to changes occurring after the test year when they substantially affect the rate proceeding, . . . such evidence may be rejected when the changes are remote or would have the effect of distorting test year data . . ." *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 564, 128 A. 2d 372, 378.

*The Rate Schedule.* Since the commission did not allow the full amount of the rate increase sought by Manufacturers, it ordered the utility to file supplement 12 to tariff No. 44, canceling supplements 3 and 7 thereto, and to file supplement 13 to tariff No. 44 containing rates designed to produce the annual revenues as allowed by the commission. The City of Pittsburgh contends that supplement 13 is unjustly discriminatory in favor of the large industrial customers.

The general rate structure in this proceeding is similar to those in the two preceding rate cases. It contains seven consumption blocks with rates ranging from $2.35 per MCF in the first block for the first MCF to a rate of .457 per MCF in the last block for all purchases over 20,000 MCF per month. There was in this proceeding, as in the two prior proceedings, detailed testimony on the factors considered by the

---

[10] J. K. Langum, an economic consultant called by the utility, testified :

"Q. Do you mean to say that we are now in a new era without ups and downs in price levels as business conditions change? A. No, of course not. The business cycle is not yet dead. We are not in any new era in which we shall not have ups and downs in business conditions, although it is true that the two post-World War II recessions thus far have been slight. In these ups and downs in business conditions, we shall have some ups and downs in prices, although probably less than in the past."

utility in arriving at the rate structure and a detailed factual discussion of each rate block. The evidence amply sustains the conclusion of the commission that the proposed general rate structure is not preferential to any class of service, and that no unfair discrimination exists between the several classes of customers or among the customers within the several classifications. See *Pittsburgh v. Pennsylvania Public Utility Commission,* 182 Pa. Superior Ct. 376, 392, 126 A. 2d 777; *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 551, 567, 128 A. 2d 372.

The City of Pittsburgh contends, however, that the commission should not have permitted Manufacturers to reduce the rate in the last block under supplement 13 to .457 per MCF from the rate of .4786 per MCF proposed by it in supplement 7 filed in the course of this proceeding. The city argues that in the course of the rate proceeding Manufacturers introduced evidence to show that the rate of .4786 per MCF in the last rate block was equitable and reasonable as applied to the industrial customers, and therefore should have been retained. It is urged also that the .4786 rate had given some preference to industrial customers to reflect the competitive factor of other fuels which industry uses on a stand-by basis when the prices of these other fuels are lower, and thus a further concession is not warranted. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 393, 126 A. 2d 777. The evidence that the rate of .4786 per MCF in the last rate block was equitable and reasonable was offered in support of the supplement proposed by Manufacturers which was designed to produce the rate increase sought by the utility. If the rate increase sought by this utility had been allowed, then of course that rate would have been rea-

sonable under such circumstances. However, the commission did not allow the full amount of the proposed increase. When it ordered the filing of a new supplement designed to produce the increase allowed instead of the increase sought, it was not unreasonable to reduce the rates for all customers. In fact, in preparing the new rate schedule Manufacturers made a uniform percentage reduction in all rate blocks. This was permissible in view of the fact that the commission had found that the proposed increase was "very uniform for consumption of 1,000 Mcf per month up to and including 20,000 Mcf, and that there . . . [was] a moderately decreasing per cent increase in revenue for monthly use from 30,000 up to 50,000 Mcf per month." Moreover, the competitive factor of other fuels used on a stand-by basis by certain industries was not the sole basis for formulating the rate of .4786 in the last block of the proposed rates under the proposed increase. Other factors were considered as in the previous rate cases. See *Pittsburgh v. Pennsylvania Public Utility Commission,* supra, 182 Pa. Superior Ct. 376, 393, 126 A. 2d 777. Finally, while it appears that the rate of .4786 was equitable and reasonable, giving consideration to all of the factors involved, under the proposed increase sought by Manufacturers, it does not necessarily follow that it would have remained equitable and reasonable under the rate increase allowed by the commission. Accepting as having been established that the rate was equitable and reasonable in the prior supplement, and a uniform percentage reduction having been made in all rate blocks in supplement 13, it cannot be said, under the circumstances existing in this proceeding, that an unreasonable and undue discrimination exists.

The order of the commission is affirmed.